ISAAC FARGO, Respondent,

*vs.*

CHRISTOPHER LADD, impleaded with HARRISON REED, Appellant.

APPEAL IN EQUITY FROM WINNEBAGO CIRCUIT COURT.

A conveyance, or an agreement between parties, made to defraud creditors, though void as to creditors, is valid and binding upon the parties themselves, and their personal representatives.

Where the grantee of property under a transfer or conveyance made in fraud of creditors, voluntarily reconveys the same to the grantor, or disposes of it according to his request, he cannot afterwards set up a valid claim to the property or the proceeds thereof, on the ground of the original fraudulent conveyance.

In cases of fraud, where the parties are *in pari delicto*, equity will not interfere in favor of either.

On the 7th day of September, 1855, the complainant filed his bill in this cause in the Circuit Court of Winnebago county, and therein set forth that said complainant was seized in fee of certain real estate and appurtenances in the village of Menasha in said county,—that some time before the month of April, 1855, he employed Lyman Fargo to sell the same to such persons and price as he should see fit,—that said Lyman Fargo as such agent made an agreement of sale of same to defendant Reed,—that said Reed was to pay to said Lyman Fargo for complainant's use certain personal property or money of the value of one thousand dollars, and on the execution of deed the said Reed was to give to complainant $530, by mortgage upon said property,—that in pursuance thereof about the 18th of May, 1855, the said complainant executed a deed thereof to said Reed, and left it with his agent Lyman Fargo, with instruction to deliver to Reed when he should comply with terms of agreement, and that afterwards said deed was delivered to Reed. That complainant after executing the deed, and before delivery,

revoked the agency of said Lyman Fargo, and that in last part of July Lyman Fargo died.

That on or about the time of delivery of deed to Reed, he, Reed, paid to Lyman Fargo or his wife for use of complainant, in part payment of purchase money, certain money or effects, and also certain personal property—that said personal property came to the defendant Ladd, and that complainant had replevied same, and that such suit was pending.

That at the time of delivery of deed to Reed $530, part of purchase money was not paid, and that the same was still due and owing to complainant. That no security therefor had been given to complainant, and that he had instituted no proceedings at law for the recovery of same, and that he was entitled to a vendor's lien thereon for such unpaid purchase money. That about the 28th of July, 1855; the said Reed and his wife executed to Roxana Fargo a mortgage upon said premises to secure the payment of said $530—that said Roxana Fargo assigned in writing said mortgage to defendant Ladd—that no consideration was paid for such assignment and that same was colorable, and at the time of execution thereof said Ladd had full and actual notice of revocation of said Lyman Fargo's agency and of all matters before stated, and of said complainant's claim to said portion of purchase money. That the said complainant had several times since the deed was given authorized Robert Fargo to obtain payment thereof or security for same. That said Harrison Reed refuses to pay same or secure the same—pretending sometimes that such mortgage to Roxana Fargo was executed by instructions of Lyman Fargo, at other times that same had been paid. That said mortgage was given and such agreement made without knowledge or consent of complainant or of said Lyman Fargo and after revocation of said Lyman Fargo's authority, and with full notice thereof, and after said Lyman's death, and that same was done fraudulently and without any good or valuable consideration and with full notice of complainant's claim—with intent to hinder and delay collection of same, and to defraud him out of same.

The said bill of complaint required the defendants to answer

under oath—and prayed that the balance of the said purchase money be deemed and declared to be a lien and charge on said premises, and that said premises be sold for the payment of the amount due to complainant for principal, interest and costs, and that said mortgage of Roxana Fargo be postponed and decreed to be subsequent to complainant's lien, and that complainant be first satisfied, and that the defendants and all persons claiming under them subsequent to said suit, &c., be barred and foreclosed of all equity of redemption in said premises, together with prayer for general relief.

To which bill of complaint the defendants in time filed their separate answers under oath.

The answer of defendant Ladd sets forth—That he did not know of his own knowledge that complainant was entitled in fee simple to said premises—but knew that title deed came from complainant, and that at the time of transfer of said property and of said mortgage he believed from the acts and transactions of said complainant and said Lyman Fargo that if the property at time of sale was in name of complainant it was only in his name to protect it from creditors of Lyman Fargo. That Lyman Fargo for a number of years had been insolvent—that the property had been in his possession and under his control, and that complainant never lived at Menasha and had never been in possession of the property—that at time of sale it was the property of Lyman Fargo and not of complainant, and that if title was in name of complainant it was so held by him in trust for Lyman Fargo.

That said Reed bargained for same in spring of 1855, and consummated the same in summer of 1855—and charges that same was made with Lyman Fargo as principal and not as agent, and that complainant did not participate in same any further than executing deed, that said Lyman Fargo after the said making of bargain and before consummation of same was very sick, and after said Lyman Fargo had received part of consideration complainant visited him at Menasha and left before bargain was consummated, leaving deed in possession or under control of Lyman Fargo—during the time of such visit

the property [the property received as part consideration] was in possession of Lyman Fargo, and that complainant left leaving same in his possession or that of Roxana, and that at the time complainant left it was supposed that Lyman Fargo would live only for a short time, and that by such acts and transactions the defendant believed at the time he purchased said mortgage that the same was given to Roxana by consent and under direction of complainant. Admits the execution of mortgage to Roxana Fargo, but denies that transfer to him was made to defraud complainant—but alleges that such transfer was bona fide and for a valuable consideration. That at time of transfer he did not know of his own knowledge that Lyman Fargo had power of attorney and same had been revoked.

A portion of the answers of defendants were excepted to by complainant as insufficient—such exceptions were sustained and the defendants required to answer further as to matters which were excepted to.

The further answer of defendant Ladd set forth that he did not know that complainant was entitled in fee simple to said property, and some time before the month of April, 1855, employed and empowered Lyman Fargo of Menasha to agree for the sale thereof, and that Lyman Fargo as such agent bargained same to defendant Reed, and that said Reed was to pay said complainant or to said Lyman as his agent, certain personal property of value of about $1000 as part payment, and gave a mortgage to complninant thereon for $530, and that in pursuance thereof the said complainant and wife executed such deed and left same with Lyman Fargo as his agent to deliver to said Reed upon his complying with said terms, but that in month of April, 1855, the title of said property was in complainant. That in said month Lyman Fargo made agreement of sale of same to said defendant Reed and agreed to send to complainant and get the deed—that in about two months the said complainant came to Menasha and left deed with said Lyman Fargo or his wife, and after he left for home the deed was delivered to Reed and the conditions of said agreement completed, and that in making such sale that said Lyman Fargo acted as principal not

as agent of complainant—that he had no knowledge or information that complainant employed Lyman Fargo to sell said property and that Lyman Fargo sold same as agent and that it was conveyed to Reed upon any agreement made by Lyman Fargo as agent and that deed was left with Lyman Fargo as his agent with any directions as to delivery—but that he is informed and believes that same was left with Lyman Fargo or wife without any directions, but left same under the sole control of Lyman Fargo. That he had no knowledge of revocation of power of attorney, except that Lyman Fargo told him that he had. That he does not know and has no information that complainant after execution of deed and before delivery revoked all authority of Lyman Fargo to act and notified Reed of the fact—denies that at the time of execution of mortgage or at time of assignment had notice of revocation of agency of Lyman Fargo, and that said Roxana knew of the fact, and denies that he had any knowledge, information or belief of any claim of complainant for unpaid purchase money—and that such mortgage was given and such assignment made without knowledge or consent of complainant—but believed that same was so given to Roxana Fargo with consent of complainant—and that same was made after death of Lyman Fargo—denies that same was done fraudulently and without any good or valuable consideration and with any notice of complainant—denies as to hinder and delay complainant or in any wise to defraud him— and the said defendant further answered such interrogatories as were not properly answered in former answer.

The answer of defendant Reed states that he did not know of his own knowledge at time alleged that complainant was entitled and seized in fee of said property, but that he is informed and believes he was—but has no knowledge, information or belief that complainant employed Lyman Fargo to make agreement of sale of same and that as such agent he made bargain for the sale of the same to him, whereby complainant and wife were to execute deed to him upon his giving mortgage to him for $530 on said premises, and that pursuant to such agreement said complainant and wife executed deed to him—admits delivery

of the deed—but denies that before delivery of same he had any notice of any revocation by complainant of Lyman Fargo's authority to act in any capacity. States that he purchased the property of Lyman Fargo and that title came from complainant. That the business was done on his part by C. Reed as his agent—that Curtis Reed as his agent in spring of 1855 made a bargain for such property with Lyman Fargo for $1500, $470 to be paid in horses, wagon, &c., $500 in indebtedness which he held against Lyman Fargo, and $530 by mortgage on premises payable in one year. That nothing was said at time to whom mortgage was to run—except it was expressly understood there was nothing due complainant—that upon making of such agreement the defendant delivered up his indebtedness against Lyman Fargo and also delivered to Lyman Fargo said personal property, and that in two months the complainant, who resided in State of New York, visited his son Lyman at Menasha—executed there said deed and left it with said Lyman or his wife and returned home. That after complainant left, his agent Curtis Reed was informed that said deed was in the hands of John Potter ready to be delivered upon this defendant's complying on his part; thereupon his agent called upon said Potter and under his direction and at his request executed and delivered to him said mortgage, and that he had no knowledge, information or belief, and neither does he believe his agent had, that said complainant left said deed with any directions and terms upon which same should be delivered—denies that at time of delivery of deed any of purchase money remained due and is still due and owing, and admits that he did not give any security to complainant, and that he is informed and believes that such mortgage was given in accordance with such agreement with Lyman Fargo—that he has no knowledge same was given to Roxana Fargo without consent or knowledge of complainant, but that he had been informed and believes that said deed was left with Lyman and Roxana Fargo by complainant with his authority and consent to deliver it upon such conditions as they might see fit and to dispose of the balance of purchase money as they saw fit, and that to the best of his

knowledge, information and belief, the same was executed and delivered before death of Lyman Fargo, and that Lyman Fargo before his death placed the deed in hands of John Potter to be delivered up on execution of said mortgage—denies that same was done fraudulently and without good and valuable consideration—with intent to defraud him in any manner or to hinder or delay him in collecting any just claim. And defendant further answered interrogatories which were not sufficiently answered in former answer.

The complainant filed a general replication.

Henry C. Taite, a witness examined on the part of the complainant, testified as follows:

I reside in th village of Neenah, in the county of Winnebago and State of Wisconsin; I am acquainted with Harrison Reed and Christopher Ladd, but not much acquainted with Isaac Fargo; I have seen him a few times; I am acquainted with Lyman Fargo and Thomas Fargo; I do not know of Ladd having ever been in the employ of Lyman Fargo and Roxana Fargo, but I know of his having lived with him; he was in the habit of carrying Fargo around in his last sickness; he boarded with Decker at the Decker House; he took care of Fargo a short time, I think some three weeks; he (Fargo) was sick but a short time, it was not more than four weeks I think; Ladd took possession of Fargo's property as soon as Fargo died, and went and lived with the family; I do not know of Ladd ever having done any teaming for Fargo; I think Fargo had no teaming to do; Ladd drove his team, but I don't know what he did with it; I have been acquainted with Christopher Ladd's pecuniary circumstances for the last eight years; he does not pay his debts, not even for whisky; I cannot tell the day nor the month that Fargo died; it was last summer or fall, can't tell what time; I have lived in Menasha ever since the 8th day of October, A. D. 1848; I know the foundry property. Question: Who owned it? Answer: Isaac Fargo, Lyman Fargo's father; while Lyman Fargo carried on business there he did it in Isaac Fargo's name; mean the foundry business.

Augustus E. Bates, examined on the part of the complainant, testified as follows :

I reside in Menasha, Wisconsin; I have resided there five and a half years ; I am acquainted with all the parties to this suit; I have known Ladd about four years or about that; I have had deal with Ladd. Question : Is he a man of property and responsibility ? I do not know whether he has property or not; all the property I know o. his having is a span of horses which he got of Roxana Fargo ; they are the same horses that were replevied by Isaac Fargo. Question: Does he pay his debts promptly ? [Objected to.] I know personally and by reputation that his credit is not very good ; he has lived with Roxana Fargo most of the time since her husband's death; I cannot state whether he is there now or not; I do not know that Ladd ever performed any labor for Lyman Fargo ; I think he was there about six weeks ; I furnished the medicines during his sickness ; Ladd went there about the time that Fargo was taken sick ; I do not know what time Lyman Fargo died ; I am acquainted with what they called the foundry property then ; it has been occupied a part of the time by Lyman Fargo and Sells, and part of the time by Lyman Fargo ; I understood that the property belonged to Isaac Fargo; all the papers I ever had drawn between them was in the name of Isaac Fargo ; the foundry business was carried on in the name of Isaac Fargo as long as Lyman Fargo had anything to do with it; Lyman Fargo held himself out as the agent of Isaac Fargo ; all the papers were in Isaac Fargo's name.

The defendants examined Roxana Fargo, who testified that, Lyman Fargo was in his lifetime my husband and son of the complainant in this suit; he resided at the time of his death at Menasha ; he was engaged in the foundry business; he has been engaged in the foundry business of Menasha some four or five years previous to his death ; the complainant, Isaac Fargo, resided at Stafford, State of New York; he was never at Menasha until about two months before my husband's death, and while he was seriously ill; I was acquainted with the foundry property carried on by my husband, and which was in the

name of complainant. Question: When, to whom, and by whom was the property sold? [Objected to by complainant's counsel.] Answer: It was sold in April or May, 1855, by my husband to Harrison Reed; Mr. Reed was to pay a portion in an indebtedness of Lyman Fargo to Harrison Reed of some five hundred dollars; it might have been a little more than that, and the balance in a mortgage mentioned in bill of complaint. The deed from Isaac Fargo to H. Reed was not made at the time of the sale, which was in April, but sometime in the month of May, and was delivered sometime in the month of July or August afterwards. At the time the sale was made, Mr. Reed delivered over to my husband the personal property, a part of the consideration of the sale. Question: State whether your husband, Lyman Fargo, at the time of this sale and transfer, had an interest in the foundry property? [Objected to by complainant's counsel.] Answer: He had; I knew that at that time my husband was insolvent, and he put his property in his father's hands; this was the property or the proceeds of property he had put in his father's hands. My husband was insolvent before he went to Menasha, and had previous to that time put his property in his father's hands. It was put into his father's hands in the name of Isaac Fargo. My husband died in July, 1855. Prior to my husband's death and prior to the delivery of the deed and after the bargains of sale, my husband's father came to Menasha to visit his son. At the time he came on that visit he brought the deed with him and signed it and gave it to my husband, Lyman Fargo. By this deed I mean the deed of the foundry property. The deed was left by Isaac Fargo when he went away, with my husband. At the time Isaac Fargo was visiting his son at the time before mentioned, he knew this sale had been made to Mr. Reed. Question: Where were the horses and wagons Harrison Reed turned out to your husband towards this property, at the time Isaac Fargo was visiting your husband? It was on the place at the time, and also when he (Isaac Fargo) had left. Question: State what you heard Isaac Fargo say about having received payment for all his interest in the foundry property, at the

time he visited his son in 1855 ? [Objected to by complainant's counsel.]   Answer : He said to me that he had received a note against me and my brother of seven hundred dollars in full for his interest in foundry property ; he also said that he had a mortgage on the place on which we then lived for one hundred dollars and the interest which I must pay to him.   That mortgage I have paid.   The note has been sued and a judgment obtained on it.   Isaac Fargo came to Menasha at that time to settle with my husband.   It was at my husband's request that Harrison Reed had the mortgage executed in my name.   Previous to my husband's death he had the sole management of the business and of buying and selling property.

The witness further testified to facts in detail, showing, or tending to show that the conveyances by the son to the father were made to hinder, delay and defraud the creditors of the former, and that the latter was party to such fraud, and permitted his son to hold, use and occupy the property in his name, and to transact business in his name, to prevent the creditors of the son from reaching it for the satisfaction of their debts.

Upon hearing of the cause upon this testimony the court below ordered and adjudged that all the right, title and interest of the defendant, Ladd, in and to the mortgage and notes in the bill described, be transferred to and vest in the complainant, Isaac Fargo, and he said Ladd was ordered to make such transfer and assignment forthwith, and that he pay the costs of suit, &c.

To reverse this judgment, the defendant, Ladd, appealed to this court.

*Gabriel Bouck*, for appellant.

*Wheeler & Edmonds*, for respondents.

*By the Court*, SMITH J,   The bill of complainant in this

case, after alleging the sale of the premises to the defendant, Reed, the payment of a portion of the purchase money, and the execution of a note and mortgage for the residue to Roxana Fargo, charges that the latter assigned said note and mortgage in writing to the defendant, Ladd, that no consideration was paid for such assignment, and that the same was colorable, and that Ladd had full knowledge of Lyman Fargo's agency, and of complainant's claim to that portion of the purchase money secured by the note and mortgage.

To these direct charges, Ladd answers, on oath, as required by the bill, admitting that he knew that the legal title to the lots sold came from the complainant, alleges that at the time of the transfer of said property, and of the assignment of said mortgage, he believed, from the acts and transactions of said complainant and of said Lyman Fargo, that if the property, at the time of sale, was in the name of the complainant, it was only in his name to protect it from the creditors of Lyman Fargo; and that the contract was made with Reed by Lyman, as principal, and not as agent; and that complainant did not participate in the same, any further than by executing the deed; that Lyman Fargo received into his possession the property taken in part payment, and when complainant came to Menasha to bring the deed, he found Lyman in possession of such property, and left him in such possession; and that he believed, at the time he purchased the mortgage, the same was given to Roxana by consent of complainant; and he denies that the transfer was made to him to defraud complainant, but alleges that said transfer was *bona fide*, and for a valuable consideration. This answer is, in the main, responsive to the bill, and is wholly uncontradicted by the evidence; but, on the contrary, is supported by the testimony of Roxana Fargo.

Even if Ladd does not occupy a position entitling him to protection as a *bona fide* holder of the note and mortgage, the conduct of the complainant would seem calculated to have justified him in looking upon Roxana as the rightful owner of the mortgage, and from whom it would be safe to purchase.

A ratification of a part of an unauthorized transaction of an agent, is a confirmation of the whole. *F. L. and T. Comp vs, Walworth,* 1 Comstock, 433. A principal cannot be allowed to conduct himself in such a manner as to mislead the public, and then avoid the consequences of his acts by a simple disclaimer of authority in the agent. But the view we have taken of this case renders it unnecessary to decide to what protection the defendant, Ladd, may be entitled, either as an innocent holder of the note and mortgage or as one contracting under a misapprehension, induced by the course of the complainant himself.

The testimony before us, coupled with the acts and relations of the parties as disclosed in the case, shows that, previous to the immediate transactions upon which the suit is founded, and even before Lyman Fargo removed to Menasha, he had been in the habit of holding more or less property in the name of Isaac Fargo, the complainant, for the purpose of keeping it out of the reach of his creditors, which he managed, used, converted, sold and transferred, at his pleasure, and for his own exclusive benefit, under an assumed agency from said complainant. We think the testimony satisfactorily shows that he procured the lot and made the improvements which were the subject of the sale to Reed in this manner; and that there entered into said property and improvements, both the remnants of his property at Lake Mills, and his own continued care and labor. And although it would seem from the testimony of Roxana Fargo, that the complainant, at some time, had some actual interest in the property (whether for advances or otherwise, does not appear,) the same testimony that develops the interest, explains the fact and manner of its extinction, with a particularity favoring its rebuttal or contradiction if the testimony were untrue.

The case here made, varies little from the simple and ordinary case of a conveyance to defraud creditors, and the use of the complainant's name by Lyman Fargo, as a cloak to conceal his property from his creditors, places the parties in the same relations, and involves substantially the same liabilities;

and this court is prepared to hold, and does hold, in accordance with numerous and uniform decisions, that conveyances of property, and agreements between parties, to defraud creditors, though void, as to creditors, are nevertheless valid and binding on the parties themselves and their personal representatives. *Hawes vs. Leaders*, Cro. Jac., 270; *Warburton vs. Akin*, 1 McLean, 460; *Reichart vs. Castolcor*, 5 Binn., 109; *Osborne vs. Moss*, 7 J. R., 161; *Hendricks vs. Mount*, 2 South., 738; *Drinkwater vs. Drinkwater*, 4 Mass., 357; *Findley vs. Cooley*, 1 Black., 262. Were, then, this a proceeding on the part of Lyman Fargo or his representatives, (not on behalf of creditors,) to divest Isaac Fargo of the legal title to the foundry property, which Lyman had thus fraudulently taken in his name, there could be no doubt of the rightful application of the foregoing doctrine to the case, and the court would be obliged to hold that the parties, being *in pari delicto*, were not entitled to relief in a court of equity.

But we think there is another principle also involved in this case. We may assume that the legal title to certain lots in Menasha, belonging, in fact to Lyman Fargo, had been vested in Isaac Fargo, with his consent, for the purpose of covering the property and concealing it from the creditors of the former. That Isaac Fargo permitted said Lyman, who was his son, to use and manage the estate to his own exclusive benefit, and ultimately to contract the sale of the same to Reed, to apply a portion of the purchase money arising upon said contract to the payment of his own liabilities to Reed, and, said sale being perfected, prepared to divest himself of the title, and executed a deed of the property, and delivered the same to his son, for the use of the purchaser, on compliance, by the latter, with such terms as his son might dictate, and which deed was so delivered, upon a mortgage being executed according to the direction of said Lyman.

While it is conceded that Isaac Fargo could not have been *compelled* to reconvey the estate to Lyman, on account of their mutual complicity in the fraud, can it be contended that it was incompetent for him to give it up, or to dispose of it otherwise,

at the request of Lyman, *voluntarily?* Most certainly not. And the whole conduct of the complainant, in permitting Lyman to exercise unlimited control over the property, and to contract it away, and in delivering up to him the title deed to be disposed of, as far as we are at liberty to judge, for his exclusive use and at his unrestricted pleasure, indicates, we think, simply an intention on his part to fullfil, to the end, the trust upon which he entered when he accepted the title, or first permitted the use of his name in the manner before mentioned. Is not the presumption strong that, but for the death of Lyman and the termination of the parental relation between the parties, the complainant would not now be found resisting the disposition made of the property by his son, and jealously seeking to thwart the realization of the claim by Ladd.

In *Turner vs. Campbell*, 3 Gratt., 77, it was held that, although a party to whom property is conveyed upon a fraudulent secret trust, may hold it as his own as against the grantor and his representatives, yet if he assents to the trust, and executes it in part, it is not competent for one *cestui que trust*, who may have got possession of the property, to set up the fraud to defeat the claim of another *cestui que trust* to his share of the property. This seems to be just; and we do not think we are weakening the force of the wholesome rule of equity to which we have before alluded—that as between the parties, agreements, void as to the creditors, would be perfectly binding, in holding, that where the grantee of property fraudulently conveyed had voluntarily reconveyed the same to the grantor, in apparent execution of the fraudulent trust, he cannot afterward make a valid claim to the property, or its proceeds, on the ground of the original fraudulent conveyance.

In this case the complainant, by his own act, divested himself of a title which he had received in fraud of law and equity, does not seem called to reinvest him.

The decree of the court below is reversed, with costs, and the cause is remanded for further proceedings in conformity with this opinion.