MARTHA I. SKEEN, REBECCA HODSON, BENJAMIN MARRIOTT, JOHN MARRIOTT, JR., AND TREZOR SOUTHWICK, APPELLANTS, *v.* JOHN MARRIOTT, RESPONDENT.

TRUST — HOW DECLARED — IN PERSONAL PROPERTY — IN REAL PROPERTY—EXPRESS TRUST—INTENT MUST APPEAR—EXECUTED AND EXECUTORY TRUSTS — RULES GOVERNING — TRUST AND DECLARATION—HOW REGARDED BY COURT OF EQUITY—ESSENTIALS—WHO MAY DECLARE A TRUST—NECESSARY LANGUAGE—TRUST IN PERSONALTY RESTING IN PAROL — PAROL TRUST — WHEN IT MAY NOT BE REVOKED — VOLUNTARY CONVEYANCE — AGREEMENT TO RECONVEY — OBLIGATION — ESTOPPEL — JUSTICE AND EQUITIES OF THE LAW—PARTICULAR CASE—DELIVERY OF PERSONALTY—VESTING OF TITLE.

*Trust—How Declared—In Personal Property—In Real Property.*

A trust in personal property may be declared, admitted or created by parol declarations, and may be proved by parol evidence, and as to such trusts the statute of frauds does not apply; but a trust relating to real property must be declared and proved by some writing executed by the parties creating the trust.

*Express Trust—Intent Must Appear.*

Where an express trust is sought to be established by an instrument in writing, the intention to create the trust must appear upon the face of the instrument.

*Executed and Executory Trusts—Rules Governing.*

When the legal estate or equitable title passes in the creation of a trust, the trust is executed, but when the trust is to be perfected in the future by settlement or conveyance, it is executory, and in the latter case the same rules govern both trusts of realty and trusts of personalty.

*Trust and Declaration—How Regarded by Court of Equity — Essentials.*

The trust being regarded by a court of equity as the property and the declaration of trust as the disposition of property, it is essential that the language employed in the creation of a trust, should be such as to leave no room for reasonable controversy, as to the intention of the donor.

*Who may Declare a Trust—Necessary Language—Trust in Personalty Resting in Parol.*

In general every person competent to make a will, enter into a contract, or hold the legal title to property, has the power to create a trust even in himself and dispose of his property in that way, but to fasten a trust upon personalty, by parol, the language used must amount to a clear and explicit declaration of trust, for if the terms and object of such a trust be left in doubt or confusion a court cannot enforce it.

*Parol Trust—When it may be Revoked.*

When once a trust has been effectually created by parol, it cannot afterwards be altered or revoked by the person who created it.

*Voluntary Conveyance — Agreement to Reconvey — Obligation — Estoppel.*

Where a conveyance is made in contemplation of a criminal prosecution and to avoid seizure, no existing rights of third parties being disturbed thereby, and there is a verbal understanding between the parties that the property would be reconveyed in the future, the moral obligation to reconvey is the same as if the agreement had been in writing, and a reconveyance will effectually divest such grantee of all title to the property and estop him from thereafter claiming under the original conveyance.

*Justice and Equities of the Law.*

The law is not so inequitable and unjust as to prevent a person from fulfilling his obligations of good faith and honor.

*Particular Case—Delivery of Personalty—Vesting of Title.*

Where circumstances are such that reconveyance of property would revest the title in the original grantor, and the property is sold by the grantor and conveyed by the grantee to a third person, without objection, the delivery of a note, which represented a portion of the purchase price to the original grantor, vested the title to it in him unless valid conditions were imposed at the time of delivery.

*Evidence—Of Trust Resting in Parol—What held Insufficient.*

Where the evidence offered to sustain a trust, resting on parol, is indefinite, uncertain and equivocal, and consists substantially of nothing more than statements of admissions and declarations of defendant's intention to provide for his first wife's children at some time in the future, or at his death, and proof of the admissions and declarations depends entirely upon the uncertain recollection of the witnesses, as to the exact language used by the alleged trustee, at a time long anterior to the giving of the testimony, the court will receive the evidence with great caution, and such evidence alone must be held to be insufficient to establish an express trust.[1]

(Decided May 11, 1900.)

---

[1] *Chambers* v. *Emery*, 13 Utah, 374.

Appeal from the Second District Court Weber County. Hon. H. H. Rolapp, *Judge.*

Action by plaintiffs to have declared and established an express trust in their favor in a certain alleged fund alleged to have been delivered to defendant for the benefit of plaintiffs. From a judgment for defendant plaintiffs' appealed. *Affirmed.*

*W. L. Maginnis, Esq.* and *George Halverson, Esq.,* for appellants.

"A parol agreement made at the time of executing a conveyance of real estate, that the grantee shall hold the property for the grantor until sold, and when sold pay the proceeds to him, is void as an attempt to create a trust (in real property) by parol, and the land and money for which it is sold, belongs to the grantee. A mere intention after such sale, to pay the money to the grantor, or invest it for him, the grantee still retaining it, does not make it the money of the grantor." *Walford* v. *Farnham,* 46 N. W. 295 (Minn.); *Moore* v. *Horsly,* 40 N. E. 323 (Ill.); *Montgomery* v. *Craig,* 27 N. E. 427 (Ind.); *Randall* v. *Constans,* 23 N. W. 530 (Minn.); *Murray* v. *Murray,* 53 N. E. 946 (Ind.); *Gee* v. *Thraikill,* 25 P. 588 (Cal.); *Doran* v. *Doran,* 33 P. 929 (Cal.); *Feeny* v. *Howard,* 21 P. 984 (Cal.); Rev. Statutes 1898, Secs. 2461, 1974, 2464.

"To fasten a trust on (personal) property by parol declarations it is only necessary that the language used clearly and explicitly manifest the owner's purpose to transfer the right and point out with certainty both the subject of the trust and the person who is to take the beneficial interest." *Roche* v. *George,* 20 S. W. 1039, (Ky.); *Williams* v. *Haskins,* 29 A. 372 (Vt.); *Heartley*

v. *Nicholson*, L. R. 19 Eq. 233, cited in *In re* Smith Est. 22 A. 916 (Pa.); *Falk* v. *Janes* 26 A. 138 (N. J.); *Gerrish* v. *Institution*, 128 Mass. 159; *Bath Sav. Inst.* v. *Hathorn*, 33 A. 839, Me.

"But an intention to create a trust may, sometimes, be inferred from conduct and circumstances, without any express declaration." 27 Am. & Eng. Ency. 56.

"It is well settled that the owners of personal property may impress upon it a valid present trust, either by a declaration that he holds the property in trust, or by a transfer of the legal title to a third party upon specified trusts, in other words he may constitute himself or another person trustee. If he makes himself trustee, no transfer of the subject-matter of the trust is necessary; but if he selects a third party, the subject of the trust must be effectual to pass the legal title." *In re* Smith's Estate, 22 A. 916; Bispham Eq. 78, 65; Perry on Trusts, Sec. 86.

"Nor is any particular form of words necessary to establish a trust, but the evidence to establish it must be clear and convincing, both as to the intent to establish and the execution of that intent. And a trust in personal property may be created for the benefit of the grantor or the donor himself, or for him and another, in which case the legal title will vest in the trustee, subject to the trust." *Williams* v. *Haskins*, 29 A. 372 (Vt.); *Gerrish* v. *Institution*, 128 Mass. 159; *Bath Sav. Inst.* v. *Hathorn*, 33 A. 839 (Me.); *Hellman* v. *McWilliams*, 11 P. 659 (Cal.); *O'Niel* v. *Greenwood*, 64 N. W. 513 (Mich.) *Williamson* v. *Yager*, 15 S. W. 660; *In re* Smith's Estate 22 A. 916 (Pa.); *Falk* v. *Janes*, 26 A. 138 (N. J.); *Roche* v. *George Estate*, 20 S. W. 1039 (Ky.); *Conn. Sav. Bank* v. *Albee*, 25 A. 488; *Landon* v. *Hutton*, 25 A. 953 (N. J.); *Martin* v. *Funk*, 75 N. Y. 134; *Guion* v. *Williams*, 7 N. Y. S. 786; *Day* v. *Roth*, 18 N. Y.

448; *Maybie* v. *Bailey*, 95 N. Y. 206; *Gillman* v. *Mc-Ardle*, 99 N. Y. 461; *Hamer* v. *Sidway*, 27 N. E. 256, 124 N. Y. 549; *Milholland* v. *Whalen*, 44 L. R. A. 206 (Md.); *Booth* v. *Oakland Bank*, 54 P. 370 (Cal.); *Bedell* v. *Scoggins*, 40 P. 954 (Cal.); *Bellville* v. *Mitchell*, 51 P. 63 (Kan.); *Chase* v. *Perley*, 19 N. E. 398 (Mass.); *Taft* v. *Snow*, 45 N. E. 752, (Mass.); *Collins* v. *Phillips*, 59 N. W. 40; 2 Pom. Eq. Juris. Secs. 997, 1001. Bispham Eq. 64, 64, 63, 73; Fetter on Eq. 113; 8 Am. & Eng. Ency. 1323; 27 Am. & Eng. Ency. 54.

"When the court considers that there has been a declaration of trust, it is a trust executed, and the court will enforce it, whether with or without consideration." *Milholland* v. *Whalen*, 44 L. R. A. 206 (Md.); *In re* Smith's Estate, 22 A. 916 (Pa.); *Cushing* v. *Blake*, 30 N. J. Eq. 689; Perry on Trusts, Sec. 359.   .

*Messrs. Richards & Allison* and *William H. Smith, Esq.*, for respondent.

It is a uniform and well settled rule that casual and indefinite expressions of mere inchoate intentions are insufficient to create a trust.   1 Perry on Trusts, (5th ed.) Secs. 77, 86, 97, 99 note 2; *Jones* v. *Loch*, L. R. Ch. 25; *Allen* v. *Withrow*, 110 U. S. 119; *Harris* v. *Bratton*, 13 S. E. 447; *Maginnis* v. *Jacobs*, 35 N. E. 214; *Hamilton* v. *Hall's Estate*, 69 N. W. 484; *Harrison* v. *McMennony*, 2 Edw. Ch. 251; 2 Pom. Eq. Jur., Sec. 1009.

It is asserted by plaintiffs that the alleged trust in this case is an express trust and was created by parol.   This of itself is suspicious and throws discredit upon their entire case, for express trusts such as this is claimed to be are generally created by written instruments which point out directly and expressly the property, persons and purposes of the trust.   1 Perry on Trusts, Secs. 24, 86; 27 Am. & Eng. Ency. of Law, 6; Beach on Trusts, etc., Sec. 52.

In order to establish a parol trust either in real or personal property (for the rule is the same in both instances) the evidence must be full, precise, clear, convincing and satisfying, and must find some support in the surrounding circumstances and in the subsequent conduct of the parties. *Hamilton* v. *Hall*, 69 N. W. 484; *Allen* v. *Withrow*, 110 U. S. 119; *Chambers* v. *Emery*, 13 Utah, 374; 2 Pom. Eq. Jur. Sec. 1008, 1009; *Crissman* v. *Crissman*, 23 Mich. 217, 221, 222; *Sowles* v. *Witters*, 35 Fed. Rep. 463; *Harris* v. *Bratton*, 13 S. E. 447; 1 Perry on Trusts, Sec. 77, 86, 83; *Dalton* v. *Dalton*, 14 Nev. 419.

To constitute a trust on personal property, the owner must *unequivocally* declare either orally or in writing that he holds it *in presenti* in trust for another. 1 Beach on Trusts, etc., Sec. 52; 1 Perry on Trusts, Sec. 86; *Hamilton* v. *Hall*, 69 N. W. 484; *Souverbye* v. *Arden*, 1 John Ch. 240; *Bunn* v. *Winthrop*, 1 John Ch. 329.

Verbal admissions of the alleged trustee ought to be received with the greatest caution. No species of evidence is more dangerous or unreliable. 1 Greenl. Ev. Sec. 200; *Chambers* v. *Emery*, 13 Utah, 374 and cases cited. *Midmer* v. *Midmer*, 26 N. J. Eq. 306.

It must appear clearly and definitely from the evidence that a trust was *intended* to be created and declared — and was in fact, created and declared, — that is, that the contract creating the trust was completely and irrovocably executed. *Cowan* v. *Wheeler*, 25 Me. 267; S. C. 43 Am. Dec. 283.

No trust is created or declared if the words used confer a mere *power* or authority and are not imperative on the donee. 1 Perry on Trusts, Sec. 248, 552, 248 and notes; *Eldredge* v. *See Yup Co.*, 17 Cal. 55; *Eldredge* v. *Heard*, 106 Mass. 582; *Greenough* v. *Wells*, 10 Cush. 576; *Stanley* v. *Colt*, 5 Wall, 168.

## STATEMENT OF FACTS.

This action was brought to have declared and established an express trust in favor of plaintiffs, Martha I. Skeen, Rebecca Hodson, Benjamin Marriott and John Marriott, Jr., in a certain alleged fund of $4,000, which, it is claimed, was delivered to defendant John Marriott, by the plaintiff Trezor Southwick.

So far as is material to the consideration of this case, the complaint, which was filed August 24, 1898, charges in substance that, on February 15, 1888, one Trezor Southwick delivered to the defendant $4,000 to be held by him in trust for his own use and benefit during his lifetime, and for the use and benefit of the four plaintiffs first above mentioned at his death; that the defendant has wholly disregarded his trust, and invested a part of the fund in sheep, and expended the remainder thereof for his use and benefit, and has sold all of the sheep, except about 1,292 head, which are still in his possession; that he disavows and repudiates the trust, and claims the sheep as his individual property; that the plaintiffs did not know of the trust in their favor until March, 1898; that the defendant is old and infirm and afflicted with weakness of mind and loss of memory; and that he is unduly influenced by various parties, and is incompetent to administer the trust. The prayer is for the establishment of the trust, for the appointment of a receiver and for other relief. The answer consists of a general denial of all the allegations of the complaint.

From the evidence it appears that the defendant was a polygamist, having had four wives, only three of whom were living at the time, it is claimed, the alleged trust was created, his first wife having died prior to that time and prior to the year 1886. The first wife's name was Susan, the second Elizabeth, the third Trezor, and the fourth Mar-

garet. All had children, the first wife having left.six surviving her. The four plaintiffs first above mentioned are children of the first or legal wife. The plaintiff Trezor Southwick was the defendant's third wife. In 1886, the defendant, expecting and fearing arrest and prosecution for unlawful cohabitation, conveyed his property to his wives then living, but none of it to the children of his first wife. His estate was worth about $16,000. To Trezor Southwick he conveyed a corner lot on Twenty-third Street and Washington Avenue, in Ogden City, on which lot she resided with her children, and 21 acres of land on Salt Creek, and gave her 100 head of sheep. Shortly thereafter, in January, 1887, he was prosecuted and sentenced to six months in the penitentiary for unlawful cohabitation. It appears that he so disposed of his property without consideration, but with the understanding that, when he returned from the penitentiary, it was to be transferred back to him, and some of it was returned to him after he had served his term in prison.

The plaintiff, Trezor Southwick, respecting the conveyance to her, testified as follows: "I did not know anything about the deed till it was brought and put in my hands. He says, this deed is to protect you and your children, and when I come back again I expect all these deeds to be turned over to me, and this property to be deeded back to me—that is, when he came back again from the penitentiary. He simply came unexpected and handed me the deed. He was expecting to go to the penitentiary pretty soon over his marriage relations. I never asked him for the deed. I offered him the deed back time and time again, and would have deeded every bit of property over to him but he didn't want to take it."

The defendant on this point testified likewise. Asked why he turned over, to his wives, all his property, he said:

"So I would have something when I came out. When I came out I received the means the same as I gave it. I told them all that. I told them after I came out of the penitentiary I wanted those notes and these deeds all to be given back to me. My first wife was dead when I went to the penitentiary and I didn't turn anything over to her children." And again he said: "I provided for the other three wives and their families by giving them a certain proportion of my property which they have had ever since. I didn't make any provision for the first wife's children at that time because I didn't think it was my duty to do so until my death. I didn't talk at that time of giving them the place on the corner of Twenty-third street. I didn't talk about giving them 25 feet of it that I remember of. I might have mentioned it of course. The deeds I made to my wives, I expected them to deed back to me after I came from the penitentiary. I didn't want the government to come down on my property if I went to the penitentiary. I wanted something left."

After the defendant had returned from the penitentiary the corner on Twenty-third street and Washington avenue was sold, and the $4,000 out of which this controversy arose, was a portion of the sum received therefor. Respecting that sale, E. T. Wooley, a witness for the plaintiffs, testified, in part, as follows: "I commenced negotiations with John Marriott to buy that corner, because I understood that he was the owner. I made the bargain with John Marriott. Agreed to pay $80 per front foot. He made the terms with me. I went down to Marriott's one day when Ellsworth was there talking to him about it. I didn't understand at the time that the title was standing on the records in the name of Trezor Southwick. In closing the deal I met Trezor; I was representing the Co-op Wagon & Machine Company at

the time. I knew I would have to get the title from Trezor Southwick and told John Marriott so. I made a visit to her house and met her to see if she was perfectly agreeable to the deal and to see whether she would sign the deeds and all that sort of thing; she said she would; that she wanted to reserve herself a home from the property. She signed the deed before I gave her this check of $2,400. I made arrangements for the company to retain the $4,000 for a year with John Marriott. I do not recollect that any interest on that note was paid to Trezor Southwick. Mr. Marriott desired the note payable to him, but I said I thought it would be better to make it out to her inasmuch as the property stood in her name, and then she could endorse it over to him. Mr. Marriott called for the first collection, and I requested him to bring the note."

Charles Ellsworth, a witness for the defendant, and who at his request, it appears, informed plaintiff, Trezor Southwick, that the defendant was thinking of selling the place, among other things, testified: "She told him that she had raised a family of children there and felt like it was her home, and she didn't want to give it up unless she was going to get another, and he promised her he would buy another place out of the proceeds of that. She said she was willing to sell on those conditions. She got a home on Twenty-second street out of the proceeds of that sale."

It appears the property was sold for $6600, of which $2600 was paid in cash and the balance, by agreement with defendant, was secured by note payable in one year. Respecting the disposition of the proceeds of sale, the plaintiff Trezor Southwick, testified: "I knew Mr. Marriott let Mr. Woolley have some money, the other money was to buy me a home.

"*Q.* Was $2600 turned over to you?"

"*A.* No, Mr. Marriott had some of it, I believe he bought a wagon and some machinery out of it. He turned over to me just what bought my home, $2100. Then I went to my new home in the fall."

The note was executed to Trezor Southwick,. dated February 15, 1888, was afterwards endorsed by her, and it seems the amount thereof paid to the defendant. The last payment on the note, it appears, was made to the defendant on April 1, 1889.

Respecting what occurred between herself and the defendant, as to the $4,000 for which the note had been given, the witness, Trezor Southwick, testified: " He said I want you to give me four thousand dollars.

" *Q.* Why didn't you take and give it to somebody else to keep for the children?

"*A.* Because I thought the father was the right one to have it.

" *Q.* Up to that time you didn't demand of him the entire sixty-six hundred dollars in cash?

"*A.* No, sir.

" *Q.* You never did?

"*A.* No, sir.

" *Q.* You didn't. instruct Mr. Woolley, that when sixty-six hundred dollars was paid to pay it all into your hands?

"*A.* Never said anything to Mr. Woolley about it.

" *Q.* You were willing that Mr. Marriott should claim it?

"*A.* Yes, sir."

And on the question of the trust the witness also said: " If you will allow me I will explain it all. Mr. Marriott said to me, after I had sold my place, 'I want you to give me $4,000 of that money for my first wife's children.' I

said 'now which of these children do you mean?' He said 'Mrs. Susy has had her share,' and, says he, 'I want this money for the other four children.' He asked me, 'can you give me that money for those children?' and I did so thinking that he would keep that money for those children, he would reserve it; that is the very word he used, 'I will reserve it for my four children.'"

The witness further stated, in substance, that the defendant said to her he would keep that money and reserve it for his first wife's children at his death, but if he could make anything out of it he would do so; that he named the four children, plaintiffs herein, as those who were to have the money, and excluded the other two children of his first wife, because they had already had their share; that she had nothing to do with naming the beneficiaries of the trust; that she left the matter of the provision for those children entirely to him, believing that he would do what was right; and that she was willing to protect them.

The plaintiff Benjamin Marriott, respecting a conversation with the defendant, in 1888, testified, as follows: "Mrs. Skeen, my sister and myself—Martha I. Skeen and myself concluded to go to Marriott settlement to see my father to see if he had made provision for his first family as we had already heard that he had done by his others. She approached the subject and was asking him if he had made any provision and he said he had not. She asked him if he intended to. He said that he did, and his intention had always been to do so. We insisted that he should set the time when he would provide for his children.

"*Q.* She insisted or he?

"*A.* We insisted that he should set a time when he would make provisions for his first family of children, and he said he would within a month some where abouts.

She did most of the talking, and she had some of the conversation with him out at the yard I think, I did not hear. That is the answer that he gave us at that time."

The same witness further testified: "I had another conversation with father in 1897 at Moroni Marriott's in Marriott settlement. Moroni Marriott was present at the time and did the talking. Moroni asked if he could not— if he did not think it was right to provide for his first wife's family as he had already done by the others, and he said yes, he thought it was right and he intended to." * * * "In that conversation he says, 'Well, there is something I would like to tell you boys,' he says, 'I have already told the women folks and thought of telling you a great many times;' he says, 'that is this: this property that I hold in my sheep belongs to my first family of boys.' I said, 'father,· do you mean your first family of boys only?' He said, 'No, sir; I mean my first family of boys and girls too.' Had another conversation with him at Ellsworth's in Warrent precinct in 1897. I just asked father if he had fixed and arranged for his first family, and he said he would, but he hadn't, but would soon do it." We, Moroni Marriott, and myself, went down on purpose to. see if we could fix this. He said he hadn't, that it was his intention to fix it, he would do it right away. Moroni was persuading father that it was right, and he there agreed again that he would fix it."

Interrogatories and answers appear in the testimony given by the defendant, as follows:

"*Q*. When you got 'this $4,000, or this note for $4,000 from Mr. Woolley, do you remember whether you said anything about keeping it for your first wife's children?

"*A*. No, sir, it was mine; I could do as I liked with it; nobody to say I shouldn't. Of course Trezor said it was hers; I don't know who told her that; it was not me."

"*Q.* When did it first come to your ears that it was claimed that Trezor had turned this property over to you and you had to give it to your first wife's children — trust?

"*A.* I guess about four years if I am not mistaken."

There is some evidence to the effect that, on numerous occasions, the defendant said the four children mentioned should have the property in question at his death, and that he would fix it so they would get it.

It appears that nothing was said to the alleged beneficiaries about the trusts until March, 1898. When the cause was tried the defendant was 82 years of age and feeble, and a short time thereafter he died. Thereupon Margaret Marriott, the administratrix of his estate, was substituted as defendant.

At the trial, the court held that the evidence failed to establish the existence of a trust and dismissed the action. Thereafter, a motion for a new trial having been overruled, this appeal was prosecuted.

A statement of the case having been made as above, BARTCH, C. J., delivered the opinion of the court.

It is obvious that the principal and decisive question presented on this appeal is whether an express trust was created, by the transactions disclosed by the evidence, for, if the plaintiffs are at all entitled to recover in this action, it must be because of such a trust. If a trust was created in this instance, it must rest on parol, for there is no writing on which it can be based. There is no doubt however that a trust in personal property may be declared admitted, or created by parol declarations, and may be proved by parol evidence. Pomeroy's Eq. Jur. Sec. 1008. The statute of frauds does not apply to trusts of personalty created by word of mouth, although this is otherwise as

to trusts of realty. Trusts are enforced in equity and are distinct from the legal estate, in so far as they are merely fiduciary interests. In this respect they are what ·uses were before the statute. In principles, it seems, there was no difference between the ancient use and the modern trust, but there was a wide difference in the application of them. By a more liberal construction of those principles and greater care against abuse, trusts are now made to answer, in general, all the beneficial ends in uses, without their inconvenience or frauds. 2 Bl. Comm. 337. An express or direct trust is usually created by an instrument in writing, which specifies distinctly the person, property and purposes of the trust. In such case the intention to create the trust must appear upon the face of the instrument. Since the statute, it is the generally accepted law of the country that where the trust relates to the disposition of real estate it must be declared and proved by some writing executed by the person creating the trust. 4 Kent Com. 305.

It has been held, however, that, if a person procure the conveyance of land to him upon the assurance that he will hold it in trust for another, the trust may be established by parol testimony of the grantor, and that if the land be sold by the grantee, the *cestui que trust*, may sue for the price. *Miller* v. *Pearce*, 6 Watts & S. 97.

A trust may be either executed or executory in kind. When the legal estate, or, if the equitable title passes, in either case, it is executed, but when the trust is to be perfected at some future time by settlement or conveyance it is executory, and the same rules which govern trusts of realty govern trusts of personalty. 1 Perry on Trusts, Sec. 16.

In the application of principles, a court of equity regards the trust as the property and the declaration of trusts as

the disposition of the property, and a disposition of property by way of a trust is as effectual and binding upon the parties, as if the property be disposed of by any other means of absolute conveyance. It is therefore, essential to the establishment of a trust, that the person who creates it, be the real owner of the property which is to constitute the trust or fund. So, it is essential that the language, employed in the creation of a trust, should be such as to leave no room for reasonable controversy, as to the intention of the donor.

In general, every person competent to make a will, enter into a contract, or hold the legal title to and manage property, may dispose of it as he chooses, and *sui juris*, has the power to create a trust and dispose of his property in that way, but in doing so he must use language showing that such disposition is intended by him. To fasten a trust upon personalty, by parol, the same as where a trust of realty is created, the language used must amount to a clear and explicit declaration of trust. The declaration relied upon must point out with reasonable certainty not only the property or subject-matter of the trust, but also the purposes thereof, and the person or persons for whose benefit the trust is created. Indefinite, vague, and equivocal expressions are not sufficient; nor are declarations of a purpose to create a trust, or mere voluntary promises to give property to a person or persons, or to dispose of it in the future for the benefit of such person or persons, when such promises remain unfulfilled, sufficient to create a trust, or any right which a court of equity will enforce. Nor is a mere intention or mere voluntary agreement to create a trust, where the owner of the property contemplates some further action by him to make it effectual, sufficient to establish the trust.

It is absolutely essential that the evidence to establish a

trust resting·on parol should be clear, unequivocal and explicit, and not conflicting in character, as to material points, for if the terms and object of such a trust be left in doubt or confusion a court cannot enforce it. No particular form of words, however, is requisite in the creation of a trust, nor for a person to declare himself a trustee. If the owner of personal property transfers it to one person for the use of another in definite and positive terms, or if such owner unequivocally declares, in writing or orally, that he holds it *in præsenti* in trust for another person, in either case the trust will be upheld. In either of such cases the trustee is liable and must account to the *cestui que trust;* and, when once effectually created by parol the trust cannot afterwards be altered or revoked by the person who created it, the same rules governing as where a trust is created by writing.

"If the trust is perfectly created, so that the donor or settler has nothing more to do, and the person seeking to enforce it has no need of further conveyances from the settler, and nothing is required of the court but to give effect to the trust as an executed trust, it will be carried into effect, at the suit of a party interested, although it was without consideration, and the possession of the property was not changed." 1 Perry on Trusts, Sec. 98.

In Beach on Trusts and Trustees, Sec. 52, it is said: "In the creation of a trust in personalty, as well as in real estate, the language employed must be definite and positive. The property which is the subject-matter of the trust must be clearly and definitely described; the purposes of the trust must be plainly indicated, and as well the person or persons who are to be the benficiaries. Ambiguous or vague and indefinite expressions will not be held to create a trust. In addition to this, the proof of the trust must be unequivocal. The declaration of a pur-

pose to create a trust is of no value, and a promise to make a donation at some future time, where there is no consideration, at best is only an imperfect gift, and will not be upheld as a trust." 1 Perry on Trusts, Secs. 24, 77, 86, 97, 252; 2 Pomeroy on Eq. Jur. Secs. 997–8, 1009; 27 Am. & Eng. Ency. Law, 54–5; *Hamilton* v. *Halls Estate*, 111 Mich. 291; *Harris* v. *Bratton,* 34 S. C. 259; *McGinnis* v. *Jacobs*, 147 Ill. 24; *Roche* v. *George's Ex'or*, 93 Ky. 609; *Beaver* v. *Beaver*, 117 N. Y. 421; *Chambers* v. *Emery*, 13 Utah, 374; *Crissman* v. *Crissman*, 28 Mich. 217; *Dalton* v. *Dalton*, 14 Nev. 419; *Harrison* v. *McMennomy*, 2 Edw. Ch. 251; *Stone* v. *Bishop*, 28 Fed. Cas. 154; *Allen* v. *Withrow*, 110 U. S. 119.

The question remains whether, in the light of the foregoing well settled principles, the evidence in the case was sufficient to show that a trust had been established in favor of the plaintiffs, who are children of the defendant and his first wife

The appellants contend that the note of $4,000 was the property of Trezor Southwick and that on February 15, 1888, she delivered it to the respondent for the use and benefit of those children, and thereby created an irrevocable trust

For the respondent it is maintained that the note belonged to the defendant Marriott, and that he never received it or the money which it represented, in trust for his children, and it is further insisted that, even if it were assumed that Trezor Southwick was the absolute owner of the note or money, still there was no creation of a trust, nor the conferring of any power, the exercise of which the court could enforce.

After careful examination of the testimony we are compelled to concede that the position of the respondent is well founded. The evidence shows that the defendant

Marriott owned the property out of which the fund was realized, and in the year 1886, fearing that he would be prosecuted and sent to prison, as he afterwards was, conveyed it to Mrs. Southwick his plural wife, with the parol agreement, or understanding between the parties, that when he returned from the penitentiary the property was to be reconveyed to him.

After his return both parties, it appears, recognized and treated the property as belonging to him; and the vendee repeatedly, in accordance with their understanding, offered to re-convey, but for some reason, not appearing, this was not done, and finally the defendant sold the property to a stranger, who arranged with him to retain $4,000 of the purchase price for a year, and, because the title stood in the name of Mrs. Southwick, it was thought best to execute the note, which was dated February 15, 1888, to her, and then she could endorse it over to the defendant, all of which was done. Afterwards the defendant collected the money and used it in the purchase of sheep and otherwise. Counsel for the appellants insist that the parol agreement to reconvey the real estate was void under the statute of frauds, that, if the conveyance was made with intent to defraud the United States government, the title passed absolutely between the parties; and that therefore the property belonged to Mrs. Southwick. Suppose we accept it as true that the conveyance passed title to the vendee absolutely, as between the parties and that she was under no legal obligation to re-convey because of the parol agreement, can it be said that, under the circumstances, there was no moral obligation for her to perform that agreement? The conveyance was made to her without consideration, and she knew all about the reasons why it was so made and accepted the instrument knowing what the understanding or agreement was without protest.

The circumstances in evidence disclose no imposition, oppression or undue influence. The arrangement seemed to be entirely satisfactory to the vendee. While the conveyance was made to her in contemplation of a criminal prosecution, and probably to avoid seizure of the property, there were then no existing rights of any third party disturbed thereby. She was, therefore, under the same moral obligation, to perform the agreement and restore the property as she would have been, if the agreement had been in writing, and there had been no question of fraud connected with the transaction, and if she had reconveyed under the agreement and circumstances, she would have effectually divested herself of all title to the property, and would thereafter have been estopped from making any claim thereto, because of the original conveyance to her. If she had made a re-conveyance, the law would not, in the absence of interposition on the part of a creditor assist her to recover the property back. The law is not so inequiteble and unjust as to prevent a person from fulfilling his obligations of good faith and honor. Such a reconveyance, under the circumstances disclosed, would not have fallen within the statute of frauds, but would have vested the title in the defendant as effectually, in law and equity, as any other conveyance from what source soever.

In Waite on Fraudulent Conveyances and Creditors Bills, Sec. 398, it is said: "Though a reconveyance cannot be enforced, the fraudulent vendee is said, in some of the cases, to be under a high moral and equitable obligation to restore the property. The law is not so unjust as to deny to men the right, while it is in their power to do so, to recognize and fulfill their obligations of honor and good faith. And until the creditors of the vendee acquire actual liens upon the property, they have no legal or

equitable claims in respect to it, higher than or superior to, those of the grantor. It has been contended that the transfer only made visible an ownership which already existed, though secretly. While the fact that title to real estate was put in one to hold for another with intent to defraud creditors, might be a defense by the trustee in an action to establish the trust, yet where the trust has been completed by a conveyance to the equitable owner the principle has no application."

In *Springfield Homestead Ass.* v. *Roll*, 137 Ill. 205, Mr. Justice Bailey said: "While a fraudulent grantee is under no legal obligation to reconvey, he is under a moral obligation to do so, and where, in fulfillment of his moral obligation, he actually makes a reconveyance, such act will be valid and binding on him, and if the rights of no innocent third parties have intervened, the fraudulent grantor will become reinvested, both at law and in equity, with the title previously conveyed to his grantee. Such reconveyance is not within the condemnation of the statute of frauds, but vests in him to whom it is made a title which the courts will recognize and protect precisely as they would a title derived from any other source." Bump on Fraud. Conv., Sec. 448; Wait on Fraud. Conv., etc., Sec. 399; *Fargo* v. *Ladd*, 6 Wis. 106; *White* v. *Brocaw*, 14 Ohio St. 339; *Mahan* v. *State of Ohio*, 10 Ohio, 231; *Wolford* v. *Farnham*, 47 Minn. 95; *Wait* v. *Day*, 6 Denio, 439; *Star* v. *Wright*, 20 Ohio St. 97.

If, as we have seen, a reconveyance of the property would have bound Mrs. Southwick, and revested the title in her grantor, then, as no reconveyance was made, but the property was sold to a third party, without objection on her part, she simply expressing a desire that another home be purchased for her out of the proceeds, which was done, the delivery of the note, which represented the

remaining portion of the purchase money, to him, was binding upon her and vested the title to it in him, unless she imposed some valid conditions as to such delivery; for precisely the same principles are involved in either case.

"Had Summer W.," says Mr. Chief Justice Gilfillan, in *Wolford* v. *Farnham*, 44 Minn. 159, a case cited by the appellants, "upon the sale of the third interest in the Hennepin island property, paid or transferred the purchase money to Eunice E. in performance of the parol trust, that act would have been binding, and the money would have become hers as between the two."

In this case, the note, which evidenced a portion of the purchase price or proceeds of sale, was delivered to the grantor, under the parol agreement, by the grantee, and the money collected and appropriated by such grantor. It, therefore, remains to be seen, assuming but not admitting that Mrs. Southwick was the owner of the property, whether the delivery was made upon valid conditions, or, in other words, whether she delivered it in trust as claimed. The evidence on this point shows that because the title to the property stood in her name, the note was executed to Mrs. Southwick and she indorsed it over to the defendant.

She testified that after he sold the place he said to her, ".I want you to give me $4,000 of that money for my first wife's children;" and that she did so, "thinking that he would keep that money for those children." She further stated that he said he would reserve the money for those children at his death; that she did not name the beneficiaries; that she left the matter of provision for those children entirely to him, and was willing to let him protect them. It is shown in evidence that he claimed and treated the property and proceeds of sale as his own, and Mrs. Southwick in her testimony stated that he was the

right one to have it, and was willing that he should claim it. Asked, on the witness stand, whether he said anything about keeping the $4,000 for his first wife's children, the defendant said: "No, sir; it was mine. I could do as I liked with it."

The record contains other similar expressions and statements, and there is much conflict in the evidence as to what was actually said between the parties as to the $4,000.

It may thus be seen that the language relied upon, for the creation of the trust by Mrs. Southwick, is ambiguous indefinite and equivocal, and when such language is considered in connection with the fact that years have elapsed since the transaction, and with the further fact that the person who delivered the money named no beneficiaries and served no notice of the trust, during all those years, until shortly before the commencement of this suit, upon any of these, who, it is claimed, were named as *cestuis que trust*, by the donee, it is impossible to conclude that a trust was established by her which a court can enforce. Evidently Mrs. Southwick, having been provided with another home out of the proceeds of sale, in accordance with her insistance, and feeling the moral obligations resting upon her, because of the parol agreement, endorsed and handed to the defendant the note as his own property, and, as she says, was willing that he should claim it, and to leave the matter of providing for his children entirely to him.

Mrs. Southwick having created no trust, the next and remaining inquiry is, did the defendant declare an express trust and constitute himself a trustee to hold the money, or the sheep and other property purchased therewith, for the use and benefit of his four children, plaintiffs in this case?

The defendant himself testified at the trial that ever since the sale, in 1888, he claimed the $4,000, and property he purchased with it, as his own, and claimed the right to do with it as he pleased. There is evidence showing that he used the money and managed the other property as an owner. Then there is also evidence showing, among other things, that, from time to time he promised to give the property to four of his first wife's children, naming those who are plaintiffs herein: that he stated that he expected to reserve the fund for them; that he was going to give it to them at his death; and that on numerous occasions he promised to fix the matter up so that they would get the property at his death. Other similar testimony appears in the record, and, as to material facts, it is conflicting. Some of the witnesses attempted to state the exact language used in conversation by the alleged trustee, notwithstanding the great lapse of time intervening since such conversation had occurred. The evidence is too indefinite, uncertain and equivocal. Stripped of useless and immaterial matter, it consists substantially of nothing more than statements of of admissions and declarations of his intention to provide for his first wife's children at some time in the future, or at his death, and the proof of the admissions and declarations depends entirely upon the uncertion recollection of the witnesses, as to the exact language employed by the alleged trustee, at a time long anterior to the giving of the testimony.

Such proof is frequently of a most unreliable and dangerous kind, and, while, as we have seen, an express trust may be established by parol evidence, still, when, as here, it is sought to establish such a trust, and divest a person of the title to his property and of its use and enjoyment, by proof of admissions and declarations of the owner, the

court will receive and consider the evidence of the same with great caution. Respecting such testimony, this court, in *Chambers* v. *Emery*, 13 Utah, 374, said: "Evidence of this class depends wholly upon the uncertain recollection of witnesses, who, through lapse of time, or mistake, or imperfect understanding, or improper or corrupt motives, may represent the deceased as having expressed an idea precisely the reverse of what was intended by him. Often, too, the slightest variation, by the witness, from the language employed by the deceased, or a different intonation or inflection, may impart an entirely different thought from that in the mind of the speaker at the time of the declaration. Reflection upon the inaccuracy of ordinary witnesses in the use of language, upon their want of original comprehension of a conversation, their liability to connect subsequent facts and circumstances with the original transaction, the impossibility of their recollecting, translating and reproducing the exact terms employed in a conversation, especially after a considerable lapse of time, must impress upon every lawyer and jurist who has had experience in the trial of causes the danger of placing substantial reliance upon this class of testimony." 1 Greenl. Ev. Sec. 200

It is true, here, the alleged trustee testified, but he was very old and feeble in mind and body and died shortly after the trial. There was no writing to show that he had disposed of his property in trust for his children. It all rests on parol.

For us to hold that the proof in this case is sufficient to establish an express trust, would be to open the doors to fraud and endanger the titles of individuals to their property.

While, however, we are clearly of the opinion that the proof is wholly insufficient to establish a trust, there is evi-

dence in the record tending to show that the defendant provided in his lifetime equitably out of his estate, for all his families and children, except the four who are plaintiffs herein; that he intended also to provide for these four before his death; and that the property here in controversy, in justice ought to belong to them as their proportionate share of their father's estate. If these things be true, then the unavoidable misfortune which will come to those children upon the announcement of this decision must be attributed to the neglect, unintentional doubtless, on the part of the owner of the property, to declare an effectual trust, and the infirmity of human law to reach such a case. In such event, ourselves powerless, we can but hope and trust that the love and affection which ought to exist in every household, and the ties of consanguinity will be strong enough to do that justice which the security of title to property forbids us to do. While in such a case, under such evidence, a trust can neither be established nor enforced by a court, yet, as we have seen, the law is not so unjust as to prevent the parties themselves from discharging obligations of good faith and honor.

Having thus decided the case upon its merits, it becomes unnecessary to pass upon or discuss any of the other questions presented, although they have not escaped our notice.

The judgment is affirmed, with costs.

MINER, J. and BASKIN, J. concur.