JENSEN et al. v. HOWELL et al.

No. 4787.   Decided August 16, 1929.   (282 P. 1034.)
Rehearing Denied December 13, 1929.

*J. H. McKnight,* of Salt Lake City, for appellants.

*A. H. Christenson,* of Provo, for respondents.

STRAUP, J.

This action was brought to have conveyances of real estate and transfers of personal property absolute in form impressed with an express trust alleged to have been orally imposed. The controversy arises among heirs, the children of E. W. Howell, deceased. He had two wives. The plaintiffs, four in number, all women and all married, are children of the first wife. The defendants, twelve in number, men and women, and all married, are children of the second wife. Howell and his first wife separated in about 1868, when the plaintiffs were young children. The children remained with him. For a few years he and the children lived with his mother. In about 1871, he, having been divorced

from his first wife, married his second wife. From thence on, and until the children were married, they lived with their father and his second wife, their stepmother. His first wife died in about 1879. Twelve children were born as the issue of the second marriage. They are the defendants in this case. The children of both wives lived with the father and his second wife as one family, until the children were married. She regarded and treated the children of the first wife as she did her own children and with the same consideration. So did the father. He, in Sanpete county, where the parties resided, was engaged chiefly in farming.

February 20, 1901, after he had been married to his second wife about 30 years, he, by warranty deed, conveyed to her all of his real estate, consisting of one parcel of about 55 acres, another of about 20½ acres, and the house and lot, consisting of several acres, where they resided. The parcels were conveyed by three separate deeds. They were all witnessed, properly acknowledged, and were recorded— one of them in February, 1901, when the deeds were executed; the other two October 1, 1909. That the deeds were delivered to the second wife in February, 1901, when they were executed and acknowledged, and were in her possession from thence on until her death, in December, 1923, is not disputed. When the deeds were executed, the children of the first wife were from 35 to 42 years of age, all married, and were no longer living with the father and the second wife, though all were on friendly and visiting terms.

In the winter of 1908, or in the early spring of 1909, Howell, who was sick of cancer, was confined to his bed. At that time some of his children by the second wife were yet minors, still living with him. Some were married, and were no longer living at his home. In March, 1909, he, by instruments in writing, witnessed and duly acknowledged, transferred to his second wife all of his shares of stock in the Empire Creamery Company, the Fairview Creamery Company, the Birch Creek Irrigation Company, the Gooseberry Irrigation Company, the Co-Op Sheep Company, and

the Union Roller Grist Mill Company. The instruments on their face constituted an absolute transfer of title in prae-senti, without any reservations or conditions whatsoever. What the value of such shares at that time was is not shown. Howell died May 27, 1909. That a transfer and delivery of such shares of stock were made to the second wife in March, 1909, is not disputed. Nor is it disputed that from the time of such transfer until in May, 1923, a period of more than 14 years, she exercised exclusive control and dominion over them. In May, 1923, she, by trust deed, conveyed to one of her sons, in trust for all of her children, the defendants herein, all of her real estate and personal property, including that conveyed and transferred to her by her husband in 1901 and in 1909. She died in December, 1923.

Up to this time there seemingly was no controversy or dispute between the parties, and no serious dispute until several years after the death of the second wife, and after her children, the defendants, had made a division and dispo-sition of the property, dividing and disposing of it in ac-cordance with the provisions of the trust deed. Then it was that the plaintiffs, or some of them, complained because they did not share, and were not permitted to share, in the di-vision. Hence this action was brought in January, 1927, by the plaintiffs filing a complaint, in which it was alleged that the real estate and personal property conveyed and transferred to the second wife by their father was conveyed and transferred with an oral agreement and understanding that the second wife was to enjoy all of such property, both real and personal, until her death, and that then the property, both real and personal, was to be divided equally among all of the children, each to have an undivided one-sixteenth part thereof, and that the defendants had knowledge of such an agreement and understanding when the trust deed was made by the second wife to them shortly before her death. All this the defendants denied.

The case was tried to the court, who made findings to the effect that the conveyance of the real estate to the second

wife in 1901 was an absolute and unconditional conveyance, and not upon any terms or conditions, as claimed by the plaintiffs, and was not charged with the alleged trust; that the personal property transferred to the second wife in 1909 was transferred upon an express oral agreement and understanding that at her death the property was to be distributed among all of the children, share and share alike, and as claimed by the plaintiffs; that the value of the shares of stock, the part to which the plaintiffs were entitled at the death of the second wife, was $1,782.42; that two of the plaintiffs had received $150 each from the defendants; and that the plaintiffs were entitled to a judgment against the defendants for $1,482.42, together with interest thereon from December, 1923, amounting to $1,-976.54, principal and interest, for which amount judgment was entered in favor of the plaintiffs and against the defendants jointly and severally, from which the defendants have prosecuted this appeal.

There are numerous assignments of error. The chief assignment, and the principal one discussed in appellants' brief, challenges the sufficiency of the evidence to support the finding that the personal property, the shares of stock, transferred to the second wife by Howell shortly before his death, was transferred with an oral agreement or understanding that upon the death of the wife such property was to be distributed to all of the children of both the first and the second wife.

That a trust in personal property may be declared or created by parol and may be proved by parol evidence, is not disputed. Such, too, is the general rule. *Skeen* v. *Marriott*, 22 Utah 73, 61 P. 296; 1 Perry on Trusts (7th Ed.) § 86. The general rule also is that, to establish a trust by parol, the evidence must be clear, unequivocal, and explicit, the property which is the subject-matter of the trust clearly and distinctly, and the purposes of the trust plainly, indicated, as well as the person or persons who are to be the beneficiaries. *Skeen* v. *Marriott*, supra; 1

Perry on Trusts, supra; Beach on Trusts, § 52. And, as expressed in many of the adjudicated cases, the evidence must be "clear, satisfactory and convincing." *Sheenan* v. *Sullivan*, 126 Cal. 189, 58 P. 543, and cases there cited.

The evidence most strongly pointed to by the respondents to support the finding is the testimony of one of the plaintiffs. She testified that during the last illness of her father she frequently called at his house to help give him food and nourishment. She testified on such occasions she had two conversations with her father in his bedroom, while he was quite ill in bed. The first was within about a week after he was taken ill. She testified that he then "was pretty bad, and he said he wondered if he was going to get over it, and wondered if he had not better fix up his property," but that she "told him that the doctor said that he had a fair chance to get well, and told him not to do anything just yet, and he said, 'All right.'" She testified her stepmother was present at that conversation. She further testified that the next conversation was some time after that, and about 6 o'clock in the morning of the day when the written transfers on March 4, 1909, were executed and acknowledged, transferring the shares of stock to her stepmother. She testified that on that occasion she called to help give her father nourishment; that she met her stepmother on the porch, who told her that her father was worse, and that "she wanted me to go in and fix the property up with him"; that the witness went in the house, passed by other members of the family in the house, and went in her father's bedroom, where he was alone in bed, and there had the following conversation with him, not in the presence or hearing of any one, except of her stepmother, after she was later called in:

"Q. State just how you found him there, and what was said. A. Well, I found him in a very weak condition; a very weak condition.

"Q. State what you said. A. I asked him how he was feeling; and he said, 'Pretty good'; and I says, 'Well, you are worse, and I see you ain't getting any better, and maybe we better fix the property up,' I said to him; and he says, 'Did mother say so? and I says, 'Yes; she said for me to come in and talk to you about fixing

the property up'; and he says, 'What do you want?' And I sat a little bit, and didn't say anything, because both of us felt pretty bad, and then he said, 'What part do you want?' and I says: 'Well, there is a big family, and they are yours as well as they are hers, and they have to be raised, and I believe you better give it all to her until she is done with it, and then we want our share'; and he says 'Yes; that is nothing but right'; and after we had talked it over he told me—

"Q. Just state what he said, as near as you can, and all that he said. A. Well, he said as little as he could, and so did I; just as little as we could.

"Q. Well, state what he said. A. And he told me to call my stepmother in, and I did so, and then he told her what we had agreed to.

"Q. Just state what he said to her. A. He told her that we had agreed that she should have the property until she was done with it, and then she was to do right by the girls, by us girls, and she said that she would; and then in the course of the conversation he told her that two or three times, and she said she would do it.

"Q. He told her what? A. He told her that he wanted her to do right; and he told her also that there was plenty for every one of them to have a nice little nest egg, if the property was properly taken care of."

The foregoing is the only statement or declaration of the father on the subject of the alleged trust. The witness further testified that a notary public was sent for; that he came to the house about 10 or 11 o'clock of the same day; that he was in the bedroom alone with her father; that she passed in and out of the room, but did not hear any of the conversation had between the notary and her father. The notary prepared six separate instruments in writing, each for the number of shares of stock held by him in each of six different companies, transferring the shares to his wife. Each instrument was dated March 4, 1909, signed by her father, witnessed by one of his sons-in-law, who married one of his daughters by the second wife, and was acknowledged before the notary who prepared the documents and took the acknowledgments. The assignments are absolute and unconditional assignments and transfers of the shares of stock by the father to his wife. Not anything was testified to by the witness that in her conversations with her father any-

thing was said concerning any of the shares of stock, or concerning any particular property, either real or personal, nor as to the nature or character of the property the wife was to have, or concerning which she was "to do right" with the plaintiffs.

The witness further testified, after her stepmother died, and the property had been divided among the children of the second wife, she had a conversation with one of her half-brothers, and that she said to him, "I don't think you have treated me right;" that he replied, "Well, I don't know, lots of us ain't satisfied; the property wasn't divided like I wanted to divide it, and if I had been going to divide it up;" but that he did not say how he thought the property ought to have been divided, or how he would have divided it. She testified that on another occasion she, after the death of her stepmother, said to several of her half brothers and sisters that "my father said he wanted by stepmother to have the property until she was done with it, and then he wanted it divided equally," and that one of her half-sisters said she wanted "us girls [the children of the first wife] to have our share," but that others present did not say anything. Again, the witness testified that on still another occasion, after the death of her stepmother, she had another conversation with one of her half-brothers, in the presence of several of her half-sisters, and asked him if he thought they had treated "us right," and that her half-brother said, "No, I don't;" that she then asked him if he was willing to help her make it right; and that he said, "I am, if the rest is," and "I believe one of the girls said she was;" that the others didn't say anything.

Another of the plaintiffs testified that a few nights before her stepmother died she asked one of her half-brothers if his mother had "the property fixed up," and that he said he thought not, and she asked him if he hadn't better have her fix it up, and he said, "No, she says, 'All you want is to get my property away from me,' " and that he wouldn't say anything more to her about it. This witness further

testified that, after the death of her stepmother and the property had been divided she had a further talk with her half-brother, and asked him "how it was about the property," if he knew much about it, and he said that he did not; that he had told his brother (the trustee named in the trust deed), if $150 was all he was going to give the children of the first wife (two of them had been given $150 each, but the record is meager as to the circumstances), to give it to them, so that they would know what they were going to get, but that his brother said, "I want them to know nothing about it until it is all fixed up," and the property all settled, as "they might make us some trouble." The witness further testified that a few days after the death of her stepmother, in a conversation with one of her half-sisters, her half-sister said that her mother said, "You are to have your share of the property with the rest of us"; that they were talking about a division of the furniture and the little things in the house; that the half-sister said her mother said the witness had always been good to her, and went there when she was sick, and that she and her children appreciated it very much, to which the witness replied, "I don't think that your mother appreciated it, or she would have said to give us a keepsake," and the half-sister said her mother said, "I don't think the other girls care anything about my old furniture, but that I want you to remember them with a keepsake," and that she wanted them to have their share of the property with the rest. She further testified that she also had a conversation with the half-brother named as the trustee, some time after the property was divided, in which he told the witness that he had heard that she was going to turn the property over to lawyers, and the witness said: "That is what we are talking about doing. We have given you plenty of time to make it right." She further testified that at this conversation she said to her half-brother, "We ought to have our share the same as the rest of you; we have tried every way to get you to do it, to divide it right"; that he wanted to know how much the witness

would take to get her signature, and she replied she wanted her share with the rest, the same as the rest, and he told her, "If you want to lose your home, or as much as your home costs, turn it over to the lawyers"; that she told him, "Nobody could make me believe that their mother would have said for us to have $150, for I says Syrilla and Marzetta [her half sisters] both said we was to have our share of the property," and that he said, "Well, I asked Syrilla about it, and she said she didn't say it just in that way"; that the witness then told him to get Syrilla, and she would prove it, but he "wouldn't go and get her." Syrilla and Marzetta, by their testimony, denied the statements.

The foregoing is the substance of all of the testimony on behalf of the plaintiffs bearing on the question of whether or not the transfers of the stock were coupled with a trust. The son-in-law who witnessed the execution of the transfers testified to the effect that they were absolute and unconditional transfers, and that not anything was said by his father-in-law that they were intended to be for any other purpose; that the instruments were not signed until between 8 and 9 o'clock that night, and that the witness, one of the plaintiffs who testified to having had the conversation with her father, was not present until after the transactions were had and the instruments executed. But he further testified that he was not there at 6 o'clock in the morning, and of his own knowledge could not say that the witness then had not such a conversation, but that not anything of that kind was said or declared by her father with respect to the transaction when the instruments were executed. All of the defendants denied making any such statements or admissions as testified to by the plaintiffs, and that they had any such conversations as testified to by the plaintiffs. To the contrary, they claim the conveyances of the real estate and the transfers of the shares of stock were absolute and unconditional, and that the second wife, with the knowledge of the plaintiffs, owned, possessed, and controlled all of such property, both real and personal, as her own from

thence on until shortly before her death, when the trust deed was made to her own children. Some attempt was made by the plaintiffs to show that after the conveyances of the real estate the father for a time still exercised some control over it; but in view of the finding and the judgment of the court below that no trust was established with respect to the real estate, and no appeal by the plaintiffs from that part of the judgment, such matter is not involved on this appeal. There is presented to us only the question of whether on the record a trust was established with respect to the shares of stock.

This case is one in equity. In this jurisdiction the binding effect of findings of the trial court in law cases is different from that in equity cases. In the former, the findings, as a general rule, are approved if there is sufficient competent evidence to support them, and, ordinarily, are not disturbed, unless it is manifest that they are so clearly against the weight of the evidence as to indicate a misconception, or not a due consideration of it. In the latter, our duty and responsibility in approving or disapproving findings when challenged are more comprehensive. In such case, on an appeal and a review on questions of both law and fact, and on a challenge of findings, the review in effect is a trial de novo on the record. On such a review, if, after making due allowance as to the better opportunity of the trial court to observe the demeanor of witnesses, of determining their credibility and the weight of their testimony, we on the record nevertheless are persuaded that a challenged finding is against the fair preponderance or greater weight of the evidence, or not supported by it, we disapprove it, and make or direct a finding or remand the case for further proceedings; otherwise, we affirm it.

The pertinent inquiry and the dominant factor here is as to whether the plaintiffs, by clear, unequivocal, and satisfactory proof, established their alleged parol trust with respect to the personal property, the shares of stock, transferred by the husband to his wife in 1909. As is seen, the

only direct evidence of such a trust, and the only declarations or statements of the father bearing on the subject, is the testimony of one of the plaintiffs as to a conversation first had with him alone, and then with him and the second wife, both deceased for many years after such conversation was claimed to have been had. In the very nature of things, such testimony was not susceptible of contradiction by any direct testimony.

The appellants at the trial objected to such testimony, claiming that the witness, by reason of Comp. Laws 1917, § 7123, subd. 3, was an incompetent witness, and, having a direct interest in the litigation and in the result thereof, was barred from testifying to such a transaction or conversation had with the father. The ruling receiving the testimony is assigned as error. All that is said concerning it in the brief of appellants is a mere reference to the statute and the citation of several cases from this jurisdiction, but which throw no light on the subject. All the respondents say about the matter is that "the contention of the defendants" with respect thereto "is untenable." Whether such a witness comes within the provisions of our statute or not is an important question. In determining it we have not been aided by counsel. Were we of the opinion that with such testimony a trust was, and without it a trust was not, established, we would be required, though unaided by counsel, to determine the competency of such testimony. However, being of the opinion, as presently will be seen, that with such testimony there is not sufficient evidence to establish a trust—at least, not by a fair preponderance thereof— we find it unnecessary to determine the competency of the testimony. We have, therefore, for the purpose of determining the question of sufficiency of the evidence, considered such testimony as though it were properly in the record.

In speaking of such character of evidence, and under similar circumstances, Mr. Justice Henshaw, for the court, in the case of *Austin* v. *Wilcoxson*, 149 Cal. 24, 84 P. 417, 419, observed that in considering what evidence may be

regarded as clear and convincing to establish a parol trust, caution is to be observed in the reception of evidence of an oral admission of a person, even when that person is living; but "when he is dead and when, from the very nature of the evidence offered, it is impossible generally to contradict the witnesses who testified, reason suggests even a greater degree of caution, and it is not stating it too strongly to say that evidence so given under such circumstances must appear to any court to be in its nature the weakest and most unsatisfactory" (citing cases). For stronger reasons must that be true when, as here, the witness, testifying to a transaction or a conversation with one long since deceased, is directly interested in the litigation, and will financially gain or lose in the result thereof.

As heretofore observed, such testimony is the only direct evidence tending to show any declaration of the father with respect to any trust, or as to an intention to impose any kind of a trust or condition in making the transfers of stock to the second wife. Though full weight be given to the testimony, and the conversation be assumed as testified to by one of the plaintiffs, yet the facts so testified to do not suffice to establish the alleged trust. As testified to by the witness, in the first part of the conversation which she claimed she had with her father alone, she told him that her stepmother had sent her in to talk with him "about fixing the property up," and inasmuch as he and the stepmother had a large family which had to be reared, she suggested to him that he "give it all to her until she was done with it and then we want our share," to which he said, "That was nothing but right," and asked her to call the stepmother in. Such does not comply with the rule that "the property which is the subject-matter of the trust must be clearly and definitely described." *Skeen* v. *Marriott*, supra; Beach on Trusts, supra.

But it may be said such was not the declaration or creation of the trust itself; that it was merely a promise or a

statement of an intention; that whatever trust was declared or imposed was when the stepmother came in. When she came in, as testified to by the witness, he "told her that we had agreed that she should have the property until she was done with it, and then she was to do right by the girls, by us girls," the plaintiffs; and that "he told her several times that he wanted her to do right, and she said she would." The property was there no more definitely described than in the fore part of the conversation. We thus have equivocal, indefinite, and uncertain language as to the subject-matter of the trust, as to the nature, degree, or tenure of interest in the property given the stepmother—"until she was done with it"—and as to the nature, degree, or interest given the plaintiffs, that the stepmother, after "she was done with the property," was then "to do right by the girls, by us girls."

The language, "do right by the girls," is capable of being understood in different ways. The most natural meaning to be given it is that, when the stepmother "was done with the property," any further disposition of it, or what part, if any, was to be given to the plaintiffs, was left to her discretion, to her judgment as to what was "right." By the language "until she was done with it" the nature and tenure of her interest in the property is so doubtful as to be incapable of ascertaining what such interest was intended to be. When was she expected to be "done with it"? When her children grew up? Or when she no longer needed it? Or was she not "done with it" until her death? If she was to have and enjoy the property during her life, how could she thereafter "do right" with the plaintiffs? Was she expected to make a will devising, or a deed conveying, an equal share to the plaintiffs with that of her own children? If so, when was she to do that? Or were her heirs, or the administrator of her estate, expected to so distribute her estate? The whole thing is so conjectural and equivocal as to be incapable of any legal effect. Yet out of such enigmas, if declared at all, must the trust be declared.

The so-called admissions of some of the defendants, as testified to by two of the plaintiffs, we think, are likewise not of much probative effect. No admission was testified to that any trust was declared or created when the transfers of the shares of stock were executed. There ■ is testimony that one of the plaintiffs, many years thereafter, after her stepmother was dead, declared to one or two of the defendants that their father said that he wanted the stepmother to have the property until she was done with it, and then he wanted it divided equally. But there is no testimony that any of the defendants admitted that their father had so declared or intended, one of the defendants only stating she was willing the plaintiffs should have their share. But her willingness to give what the plaintiffs then demanded could not affect or bind the other defendants, not assenting thereto. There is also testimony that two of the plaintiffs separately and on different occasions, again after the death of their stepmother, complained to some of the defendants that the plaintiffs had not been treated right, and that one of the defendants stated he did not think they had, but in no particular indicated in what respect they were not so treated. There also is testimony of one of the plaintiffs that one of the defendants, after the death of her mother, said to the witness that her stepmother wanted the plaintiffs to have their "share of the property with the rest of us."

The making of any such statement or admission, as well as other statements and admissions, was denied by the defendants. The fact that the stepmother, shortly before her death, by a trust deed conveyed and transferred to her own children all of her real and personal property, including that conveyed to her by her husband, is inconsistent with the making of any such admission, or with any intention of the stepmother that the plaintiffs were to share in any of her property. Verbal admissions, especially when testified to by interested parties, ordinarily are considered and

weighed with caution. Such evidence of mere repetitions of oral statements is subject to much imperfection and mistake. The party making them may be misinformed, or may not clearly have expressed his own meaning or the witness may have misunderstood him, or, by unintentionally altering in some particulars an expression used, an effect is given a statement at variance with what was actually stated or intended by the party. *Chambers* v. *Emery*, 13 Utah 374, 45 P. 192. The rule is especially applicable when the admissions relate to alleged trusts in property sought to be established by parol.

Though the admissions as testified to by plaintiffs should be regarded as having been made, yet the testimony with respect thereto is as frail and ineffectual to establish a trust in the property in question as is the testimony of the plaintiffs as to the declarations of the grantor prior to the making of the transfers. The admissions as testified to are just as equivocal, indefinite, and uncertain as to the property, the subject-matter of the trust, the nature, degree, and tenure of interest granted the wife, and as to what was to be given the plaintiffs. Such vague, indefinite, and enigmatical expressions and statements as testified to as admissions, unsupported as they are by other facts and circumstances, or by conduct of the parties, cannot be regarded as being sufficient to create a trust, and especially not to overcome the admitted written evidence of the conveyances and transfers of absolute and unconditional title of property possessed and controlled by the grantee as her own for these many years, and thereby divest her or her heirs of such title. Even though the whole of the evidence on behalf of the plaintiffs, when considered together, be regarded as sufficient to support a finding of the alleged trust, yet, when the whole of the evidence in the record, that of the plaintiffs and of the defendants, and all the facts and circumstances shown therein, are considered together, we think it manifest that such a finding is against the clear weight of the evidence.

The finding of the trial court that a trust was established is therefore disapproved, the judgment reversed and vacated, and the case remanded to the district court, with directions to dismiss the action. Appellants to recover costs.

CHERRY, C. J., and ELIAS HANSEN, EPHRAIM HANSON, and FOLLAND, JJ., concur.