## COREY v. ROBERTS

No. 5057. Decided October 10, 1933. (25 P. [2d] 940.)

*Valentine Gideon* and *Woolley & Holther*, all of Ogden, for appellant.

*Thatcher & Young* and *DeVine, Howell & Stine*, all of Ogden, for respondent.

MOFFAT, Justice.

The plaintiff is the appellant and the defendant is the respondent. In briefs and arguments the parties have been so designated and for convenience will herein be so referred to. For a long time prior to the 14th day of January, 1918, the plaintiff was the owner and in possession of certain property located on the east side of Washington avenue between Twenty-Fifth and Twenty-Sixth streets, in Ogden City, Utah. At that time the plaintiff was indebted to the New York Life Insurance Company in the principal sum of $28,000 and certain accrued interest. This indebtedness was secured by a first mortgage on the property, generally referred to as the "Corey Block" or "Corey Property."

The plaintiff was also indebted to the Utah National Bank of Ogden in the sum of $17,100 upon two promissory notes secured by a second mortgage upon the same property. Some taxes were unpaid. The plaintiff was also indebted to the bank in an additional sum which was not secured. The record discloses that after the 14th day of January, 1918, and before the time of bringing this action, a consolidation of the Utah National Bank of Ogden and the First National Bank under the latter name was effected.

The plaintiff is the mother of the defendant's wife. Warren L. Wattis, a nephew of plaintiff's husband, was vice president and active executive officer of the Utah National Bank. Before the bringing of this action, both Warren L. Wattis and A. B. Corey, plaintiff's husband, had died. It appears that Warren L. Wattis had advised the bank officials that the Coreys were working upon a proposition to better handle the indebtedness. Mr. Wattis was instructed by the bank to take such action as he deemed necessary to protect the bank's interests. On January 14, 1918, the plaintiff gave a quitclaim deed to the property in question, naming therein Warren L. Wattis as grantee. This deed was recorded on the 16th day of January, 1918. There

were thereupon opened at the bank two accounts, one entitled "Corey Block," and the other entitled "Corey Real Estate." The plaintiff remained in possession of the property, collected the rents, and deposited them in the "Corey Block" account. The bank officers drew all checks on the "Corey Block" account and paid all the bills. When there was insufficient in the "Corey Block" account, a few items were paid directly out of the bank funds. The "Corey Block" account was permitted to "pyramid" until the 12th day of November, 1919, when the account showed a balance in the sum of $7,357.04. During this period the plaintiff had received a payment of $100 or $125 each month, paid out of this account. There appears also during this period to have been a sort of joint management, the plaintiff occupying and supervising the property, collecting the rents, depositing the funds, and reporting expenses to the bank, while the bank checked the bills and accounts, paid them out of the "Corey Block" account when there were sufficient funds available.

On the 1st day of November, 1919, the plaintiff signed and acknowledged a warranty deed to Warren L. Wattis to the same property. This deed contained a clause to the effect that the deed was "given subject to that certain mortgage for $28,000.00 executed by A. B. Corey and wife under date of June 13th, 1916, and recorded in Book 2-Y of Mortgages at page 582, records of Weber County, Utah, which said mortgage, or the balance due thereon, the grantee hereby assumes. Said mortgage was given in favor of the New York Life Insurance Company." On the 15th day of November, 1919, Warren L. Wattis, his wife, Veda L. Wattis, joining in the conveyance, executed a warranty deed to Ralph D. Roberts, the defendant, whereby the same property with the same mortgage assumption clause was conveyed.

The purpose of this suit is to impress the property included in these conveyances with a trust in favor of the plaintiff subject to the mortgage lien, notwithstanding the

absolute form of the conveyances. The suit is one in equity. The binding effect of the findings of the trial court is different in equity cases from that in cases at law, in this jurisdiction. In law cases, the findings are approved if there is sufficient competent evidence to support them. In equity cases the appeal (Const. Utah, art. 8, § 9) may be on questions of both law and fact. Such is the appeal in this case. On such review the duty of this court requires an examination of all questions of law and all facts revealed by the record, and after making such examination and due allowance for the better opportunity afforded the trial court to observe the demeanor of witnesses, and more advantageous position of determining their credibility and the weight to be given to the testimony submitted, this court, analogous to a trial de novo on the record, will determine from a fair preponderance or greater weight of the evidence whether or not the findings of the trial court are supported thereby. *Lawley* v. *Hickenlooper*, 61 Utah 298, 212 P. 526.

It is likewise the law that, where conveyances, clear, unambiguous, and unequivocal in their terms, are attacked by parol evidence seeking to establish a trust or give to the documents a mortgage construction, the party so seeking must by clear, unequivocal and satisfactory proof establish the alleged trust or mortgage relationship.

From this preliminary statement of an outline of the transactions and the principles of law to be applied to the evidence, it is necessary to proceed to an examination of the evidence to determine whether or not the findings of the trial court are supported by the evidence.

Plaintiff's theory of the case is that, notwithstanding the execution and delivery of the quitclaim deed by the plaintiff to Warren L. Wattis, and approximately twenty-two months later the execution and delivery of the warranty deed, the

relationship of mortgagor and mortgagee between the plaintiff, Eva F. Corey, and the bank continued to exist, and that the defendant had knowledge and notice of the existence of that relationship at the time the defendant took over the property by warranty deed from Warren L. Wattis, and therefore defendant is also a mortgagee, or occupies the position of trustee, and holds the legal title subject to the mortgage indebtedness for the use and benefit of the plaintiff, subject to such other liens or claims as the defendant may have.

The defendant's theory is that, upon the execution and delivery of the quitclaim deed by the plaintiff to Warren L. Wattis for the bank, the relationship changed from that of mortgagor and mortgagee, and that Warren L. Wattis for the bank became the owner of both the legal and equitable title to the property, subject only to the option for a six-month period to repurchase, or to sell the property for an amount equal to or in excess of her indebtedness to the bank, and with the understanding that, if the plaintiff did not repurchase the property or make a sale within the six months, the option would cease and determine, and that thereupon Warren L. Wattis for the bank would have the absolute right to sell the property to whomsoever he could, and to give title, both legal and equitable, to the purchaser. It is further defendant's theory that, even if after the giving of the quitclaim deed plaintiff had any interest in the property other than the right of repurchase, the warranty deed which the plaintiff gave to Warren L. Wattis on November 1, 1919, operated to convey whatever interest the plaintiff may have retained in the property.

Plaintiff concedes that, to establish any other relationship, she must show by proof meeting the standard required by the courts that the defendant was not a purchaser but a mortgagee or trustee or both, and that the deed was security for the debt owing by the plaintiff to the defendant. Plaintiff also accepts the position that the proof must show

that both grantor and grantee understood that the convey-
ance was made as security for a debt and not an absolute
conveyance. If plaintiff fails to meet these conditions and
burdens of proof, her action must fail.

In determining whether a deed, absolute in its terms, is
intended as a mortgage, some of the essential elements to
be considered as laid down by the authorities are: Whether
or not there was a continuing obligation on the part
of the grantor to pay the debt or meet the obligation
which it is claimed the deed was made to secure; the
question of relative values; the contemporaneous and subse-
quent acts; the declarations and admissions of the parties;
the form of the written evidences of the transactions; the
nature and character of the testimony relied upon; the
various business, social, or other relationship of the parties;
and the apparent aims and purposes to be accomplished.

With these concessions, positions, and principles as a back-
ground before which the evidence in this case may be held
and tested, let us proceed to an examination of some of the
findings and the testimony. Many errors have been as-
signed. All of them were grouped by the plaintiff into three
classifications: (1) That the findings of the court are con-
trary to the weight of the evidence and that certain of the
court's findings find no support in the evidence; (2) errors
in excluding certain testimony offered by plaintiff; and (3)
permitting the introduction of certain alleged incompetent
and otherwise objectionable evidence on the part of the de-
fendant.

In an equity case, and particularly one in which the testi-
mony is of such character that it is necessary for the trial
court to base findings of fact upon implications, relations,
and behavior of the parties, and to determine the intention
accompanying certain acts, relations, and behavior,
it is often difficult for a trial court to determine be-
fore the issues are well developed, as the trial pro-

ceeds, what testimony is material or relevant and what is not. The presumption in such cases is that the trial court does not in making its findings consider any immaterial, irrelevant, or incompetent testimony. If the findings, as made, reveal that such findings are based upon such testimony, the appellate court would review such assignments and errors, otherwise not. As illustrative of what the court has reference to, the following question was asked and by the trial court permitted to be answered, to which exception was taken and error assigned thereon: "Now from the time you learned of the execution and delivery of that deed, do you know what was the understanding of the board of directors of the bank, whether that deed conveyed the title absolutely or whether it was intended as a mortgage?" The question is clearly objectionable. No finding of fact is made on the matter. No reference is made in the findings as to the intention or understanding of the board of directors, and as a board of directors they could have had no intention or understanding concerning the matter except as an inference drawn from reports not binding upon the plaintiff. Granting that it was error for the trial court to permit the question to be answered, the plaintiff, as revealed by the record, was not harmed. No finding being made or based thereon, the trial court evidently disregarded the incompetent and immaterial matter. So that it will be observed that the only assignments this court need consider are the assignments that the findings of the court are contrary to the weight of the evidence, and that certain of the court's findings find no support in the evidence.

Before passing to an examination of the evidence, it is to be observed that there are two stages or phases relating to the transactions pertaining to the conveyance of the property: First, the conveyance to Warren L. Wattis and the period from January 14, 1918, to November 1, 1919, or thereabouts; and, second, the conveyance by Warren L.

Wattis and his wife to the defendant November 1, 1919, and the period following.

The plaintiff, Mrs. Eva F. Corey, testified that she was 65 years old, the widow of Amos B. Corey. The premises known as the "Corey Block" consist of a garage and shops at the back and stores below with apartments above. There are two stores and twenty apartments. She had known Warren L. Wattis since childhood. They were always friends and associated in both a social and business way. She knew he was an officer of the bank. The account of the "Corey Block" at that time was carried in the name of A. B. Corey. Mrs. Corey testified further that there were at least two conversations with Warren L. Wattis about the property. By appointment he came to her apartment to talk over what could be done in relation to the property and indebtedness to the bank. They sat by the grate and talked it over for about half an hour; that she had confidence in Warren L. Wattis and trusted him. Referring specifically to Warren L. Wattis, the plaintiff testified: "He said that it would be better for me if he would take it over for the bank in his own name and manage it, because the bank would have money to carry on the running of the property, and in the course of time it would be better for me because it would be paid off, and that it would be easier for me, and that the bank would be willing to do that and wait for their money which we owed them." Upon cross-examination and replying thereto she further testified: "I said that would be all right, because that would save the property for me, or for the estate, whichever you may call it, and I had full confidence it would * * * as to the management of the property through the bank, that it would save the property from being foreclosed and taken away from us. He was willing to do that and undertake it, and in the meantime the property would be safe for me eventually. It was to be handled under the management of the bank and I was to take care of the collection of the rents, and I did so and deposited them

in the bank. There was one tenant I couldn't collect from and I went to the bank and asked Warren if he wouldn't see to that." Mrs. Corey further testified that it was under this arrangement and "as collateral" that she gave the deed to Mr. Wattis, and she did not intend to part with the title and ownership of the property. Nothing was paid for the deed, and at that time the mortgage debt to the bank was not due, but interest was delinquent. A monthly allowance out of the rents was to be made, and plaintiff was to have control of the place and have control of renting and repairs. She also testified that Mr. Wattis said that the bank did not want the property but wanted their money. There is no evidence in the record as to whether the quitclaim deed, bearing date the 14th day of January, 1918, was signed at the time of the conversation referred to by plaintiff or at any other time. The deed was duly acknowledged and recorded.

The only other reference to the transaction prior to the execution of the deed or referring to matters leading up to the transaction is made in a minute entry of a meeting of the board of directors of the bank, bearing date the 9th day of January, 1918, which reads:

"Vice-President Wattis reported that Mrs. Eva F. Corey and A. B. Corey were working on a proposition to get their matters in better shape and he was instructed to take such action to protect our interests as deemed necessary."

Having examined all the testimony leading up to the transaction, it is now necessary to review the behavior, statements, and relations of the parties to each other and the property for the balance of the first stage or period and until November, 1919. The record does not disclose what, if anything, remained in the A. B. Corey account at the bank or what happened to it. The record, however, does disclose that a new account entitled "Corey Block" was opened. The first entry appearing in this account is dated January 16, 1918, or two days after the date of the quitclaim deed.

John Walker, who subsequently became state treasurer, was at that time (1918) employed at the bank as bookkeeper and teller, a position he occupied until the consolidation with the First National Bank of Ogden. Mr. Walker testified that he was instructed by Mr. Wattis that the bank would take over the management of the Corey Block and that part would be assigned to him; that Mrs. Corey would actively manage all things connected with the block, including the renting and collecting of rents; that all bills and repairs should be submitted to Mr. Walker; that requests for repairs should be investigated to determine whether or not they should be allowed, because he (Mr. Wattis) had to manage the block for the good of the bank to see that it would pay out the expenses and obligations the bank was holding against it. The rents were deposited in the "Corey Block" account, and, when properly checked and audited, the bills were paid upon checks drawn on the "Corey Block" account and signed by Mr. Wattis. There was one tenant who was delinquent in a large sum, and Mrs. Corey did not collect that, the bank took active supervision of the collecting of this account. No expenditures of money or payments of bills were to be made without their being submitted to Mr. Wattis for approval. That, in order to determine whether the property was able to pay the loans it was carrying, the bank would take active supervision of the account.

Mr. Walker also testified that Mr. Wattis said:

"We are going to take a deed from the Coreys in order to secure our claim in case we have to pay or assume the first mortgage; at present we have already had to advance most of the interest payments and what it has taken to keep the New York Life Insurance Company from foreclosing their account because of it being past due."

The building was checked over by Mr. Walker, repairs were recommended, and the heating plant improved. An account was kept of all money deposited and withdrawn. A statement was made on the stub of each check at the time,

indicating the purpose to which it was applied. Mrs. Corey received an allowance designated on the stubs of the checks as salary, at first $100 a month, which was later increased to $125. About the end of the period, Mr. Wattis said to Mr. Walker:

"You will be released from the 'Corey Block' account, if Mr. Roberts takes over the active management of that block, and you will make us up a statement as to the expenses and income of that block for submission to him so that he can find out whether it is a paying proposition, and you will be relieved from further duty from the Corey Block account."

During the period from 1918, in January, to November, 1919, the "Corey Block" produced enough to carry the interest, taxes, and expenses. Sometimes the interest was paid out of the "Corey Block" account, but once or twice for some unknown reason the bank paid interest and charged it to "Other Real Estate," and this was done when the "Corey Block" account could have paid that amount of money. Omitting intermediate entries in the "Corey Block" account, in fact the long list of entries, other than the first few entries of January, 1918, and until October 1, 1919, the account reflects the fact of opening, the nature of the account, the total accumulations up till the 12th day of November, 1919. The entries after that date lap into the second stage or phase of the transactions relating to the property. This is all included in several sheets of figures, and is too voluminous to repeat here. The part of the following statement relating to the second period beginning with the entry of November 14, 1919, will be referred to when it comes to summarizing the evidence relating to the second period of these transactions relating to this property, and applying them for the purpose of indicating or discovering the intentions and purposes of the transactions. Plaintiff's Exhibit 74, in deleted form, as above explained, and defendant's Exhibit X in full relating to these bank accounts are as follows:

"PLAINTIFF'S EXHIBIT NO. 74
COREY BLOCK                First National Bank, Ogden, Utah.
(Duplicate statement from January, 1918, to November 15, 1919.)

| Old Balance | CHECKS | | | DEPOSITS | | | (Balance) |
|---|---|---|---|---|---|---|---|
| 7 | | Balance | 1918 | | | | |
| | | | Jan 16 | 77.50 | Jan 16 | | 77.50s |
| 77.50s | Jan 16 | .90 | Jan 16 | | Jan 16 | | 76.60s |
| * * | * *. | | 1919 | | | | |
| | Oct 1 | 4.50 | | | | | |
| | | 5.50 | Oct 1 | | Oct 1 | | 7,242.97s |
| | Oct 2 | 11.00 | | | | | |
| | | 107.45 | Oct 2 | | Oct 2 | | 7,124.52s |
| | Oct 4 | 16.01 | | | | | |
| | | 1.75 | Oct 4 | | Oct 4 | | 7,106.76s |
| | Oct 6 | 125.00 | Oct 6 | 129.30 | Oct 6 | | 7,111.06s |
| | | | Oct 7 | 100.00 | Oct 7 | | 7,211.06s |
| | Oct 11 | 9.50 | Oct 11 | | Oct 11 | | 7,201.56s |
| | Oct 14 | 16.92 | Oct 14 | | Oct 14 | | 7,184.64s |
| | Oct 15 | | Oct 15 | 103.00 | Oct 15 | | 7,287.64s |
| | Oct 17 | 95.05 | Oct 17 | | Oct 17 | | 7,192.59s |
| | Oct 18 | 23.00 | Oct 18 | | Oct 18 | | 7,169.59s |
| | Oct 20 | 41.25 | Oct 20 | 84.00 | Oct 20 | | 7,212.34s |
| | | | Oct 23 | 31.50 | Oct 23 | | 7,243.84s |
| | Oct 31 | 15.00 | Oct 31 | | Oct 31 | | 7,228.84s |
| | Nov 4 | 125.00 | Nov 4 | 326.53 | Nov 4 | | 7,430.37s |
| | Nov 8 | 15.00 | | | | | |
| | | 15.00 | Nov 8 | 50.00 | Nov 8 | | 7,450.37s |
| | Nov 12 | 35.10 | | | | | |
| | | 16.08 | | | | | |
| | | 20.30 | | | | | |
| | Nov 12 | 21.85 | Nov 12 | | Nov 12 | | 7,357.04s |
| | | | Nov 14 | 1,500.00 | Nov 14 | | 8,857.04s |
| | Nov 15 | 15.00 | | | | | |
| | | 8,294.22 | Nov 15 | 750.00 | Nov 15 | | 1,297.82*" |

Sheet No. 1              DEFENDANT'S EXHIBIT 'X'          Account No. —
                        Utah National Bank of Ogden
                             Corey Real Estate
                         Wash. Ave., Ogden, Utah

| Date | | No. | Items | Debits in Detail | Total Debits | Balance | Total Credits |
|---|---|---|---|---|---|---|---|
| | Jan. | 1918 | | | | | |
| | Jan. | 16 | Taxes 1917 | | 941.20 | 941.20 (red) | |
| | | 29 | Filing fee Corey Co. v. Muller | | 3.00 | 944.20 (red) | |
| | June | 11 | Prin Loan N. Y. Life | 1000.00 | | | |
| | | | Int. on $750.00 N. Y. Life | 1.75 | | | |
| | | | Int. on 27,000 N. Y. Life | 810.00 | 1811.75 | 2755.95 (red) | |
| | Aug. | 21 | 10616 Note Eva F. Corey | 15000.00 | | | |
| | | | 11612 Note Eva F. Corey | 2100.00 | | | |
| | | | 11613 Note Eva F. Corey | 591.20 | 17691.20 | 20447.15 (red) | |
| | Nov. | | | | | | |
| 1919 | June | 18 | Payment to N. Y. Life Ins. | | | | |
| | | | Prin. | 1000.00 | | | |
| | | | Int. | 780.00 | | | |
| | Nov. | 15 | Int. on Def. Pymt. | 2.10 | 1782.10 | 22229.25 (red) | 22229.25 |

Mr. Walker also testified that, if the bank became the owner of a piece of real property in January, 1918, the first entry in the account would be the amount held by the bank against the property at that time.

The receipts accumulated in the "Corey Block" account until they totaled in November, 1919, a balance of $7,357.04 as shown by the account balance of November 12, 1919.

The testimony of Lawrence Amos Corey, a son of plaintiff, as applied to matters before the defendant took the property over from Mr. Wattis, relates to a conversation with Mr. Warren L. Wattis. Mr. Corey says that he went to the bank and said to Warren L. Wattis that he understood that the bank was figuring on selling his mother out; to which Wattis replied:

"Now Lawrence, you know as well as I do that I am holding this property to protect your mother as well as to protect the bank, and that I will go to any extent to do so. It is going to work out all right."

It is clearly established by the evidence that there was no change in the relationship of the bank and plaintiff at the time of the execution of the quitclaim deed on the 14th day of January, 1918. Matters moved on substantially as before, except the joint management. At that time no financial change took place. The plaintiff owed the bank the same amount as before, no more and no less. At that time the bank retained all of the notes theretofore taken from the plaintiff and the same mortgage security. When Warren L. Wattis received the quitclaim deed, it cannot be questioned that he received it in some capacity other than that of an ordinary grantee. Mrs. Corey owed Warren L. Wattis nothing personally, and he paid nothing for the conveyance. Warren L. Wattis was authorized by the board of directors of the bank to take such action as he deemed necessary to protect the interests of the bank. Whatever interest Warren L. Wattis acquired by virtue of the quitclaim deed in so far as the bank was concerned was in the nature of a trust. Had the plaintiff claimed no interest in the property described in the quitclaim deed, the bank could have required a con-

veyance to have been made to the bank. Likewise, had the plaintiff paid to the bank the sum due to it, plaintiff could not only have required the bank to release the mortgage and cancel and return the evidences of the indebtedness, but could have required Warren L. Wattis to reconvey to her the property.

Under the provisions of section 4871, Comp. Laws Utah 1917, "a fee simple title is presumed to be intended to pass by a conveyance of real estate, unless it appears from the conveyance that a lesser estate was intended." It is therefore clear that because of the quitclaim deed of January 14, 1918, nothing appearing from the conveyance itself to the contrary, the fee-simple title vested in Warren L. Wattis. From the testimony heretofore referred to and the situation and relationship of the parties, it is likewise clear that War-ren L. Wattis had no individual or personal interest in the property, although the holder of the fee-simple title by virtue of the conveyance as provided by the statute. He therefore held the title for one of two purposes, viz., either to be conveyed to the bank or, as counsel have indicated, its nominee, subject to the conditions upon which Mr. Wattis received the title, or to be reconveyed to Eva F. Corey upon the performance of conditions imposed.

As heretofore indicated, this is an action in equity, and it is our duty to determine both questions of law and questions of fact. It is likewise our duty as indicated by the cases heretofore decided by this court to affirm the decision of the trial court, unless the evidence clearly preponderates against the findings and judgment of the trial court. *Clark* v. *Clark*, 74 Utah 290, 279 P. 502; *Singleton* v. *Kelly*, 61 Utah 277, 212 P. 63, and cases there cited.

In examining the evidence for the purpose of determining whether the deed is what upon its face it purports to be, or whether it is a mortgage or an unconditional or a condi-

tional sale or imposed a trust upon Warren L. Wattis or otherwise, parol evidence, extrinsic circumstances, ■ and the relationship of the parties may be resorted to, not for the purpose of varying the terms of the written instrument, but for the purpose of showing the object and purpose for which the conveyance was made.

"It is an established doctrine that a court of equity will treat a deed, absolute in form, as a mortgage, when it is executed as security for a loan of money. That court looks beyond the terms of the instrument to the real transaction; and when that is shown to be one of security, and not of sale, it will give effect to the actual contract of the parties. As the equity, upon which the court acts in such cases, arises from the real character of the transaction, any evidence written or oral, tending to show this is admissible. The rule which excludes parol testimony to contradict or vary a written instrument has reference to the language used by the parties. That cannot be qualified or varied from its natural import, but must speak for itself. The rule does not forbid an inquiry into the object of the parties in executing and receiving the instrument. Thus, it may be shown that a deed was made to defraud creditors, or to give a preference, or to secure a loan, or for any other object not apparent on its face. The object of parties in such cases will be considered by a court of equity: it constitutes a ground for the exercise of its jurisdiction, which will always be asserted to prevent fraud or oppression, and to promote justice." *Peugh* v. *Davis*, 96 U. S. 332, 336, 24 L. Ed. 775, and cases cited.

The same doctrine is laid down in the case of *Duerden* v. *Solomon*, 33 Utah 468, 94 P. 978, and the above text is cited and approved by this court in *Thomas* v. *Ogden State Bank*, 13 P. (2d) 636.

The parties usually do not question either the language used or the construction to be put upon the language of the conveyance. As in the instant case, the parties admit the conveyance, and its effectiveness for conveying or transferring the fee-simple title from the plaintiff to Warren L. Wattis. Plaintiff says its purpose was "as collateral" or for mortgage security, and, when the bank was paid, the title was to be reconveyed to the plaintiff; while defendant's theory of the conveyance is "that upon the execution and

delivery of the quitclaim deed by plaintiff to Warren L. Wattis *for the bank* the relationship changed from that of mortgagor and mortgagee, and Warren L. Wattis for the bank became the owner of both the legal and equitable title to the property, *subject only to the option for a six months period to repurchase, or to sell the property for an amount equal to or in excess of her indebtedness to the bank, and with the understanding that if the plaintiff did not repurchase the property or make a sale within the period of six months, the option would cease and determine."* (Defendant's Brief, p. 24. Italics added.)

Both parties, therefore, to this controversy maintain that the quitclaim deed made by the plaintiff to Warren L. Wattis was intended to be and the purpose was different than what it purports to be from the face of the instrument. Plaintiff maintains that the relationship between the bank and plaintiff was not changed; defendant takes the position that it was a conveyance to Wattis subject to certain conditions of sale or repurchase. Under either theory the bank could not dispossess the plaintiff without a foreclosure or other termination of plaintiff's interest, whether Warren L. Wattis had conveyed to the bank or its nominee or reconveyed to the plaintiff, and we know of but two methods whereby this could be accomplished, first, by foreclosure, and, second, by a valid release made by plaintiff.

"A mortgage of real property shall not be deemed a conveyance, whatever its terms, so as to enable the owner of the mortgage to recover possession of the real property without a foreclosure and sale." Section 7253, Comp. Laws Utah 1917.

And while the presumption prevails that the instrument is what it purports to be on its face, an absolute conveyance of the land, and in order to overcome this presumption and establish its character as a mortgage or deed of trust the evidence must be clear, satisfactory, and convincing, we approach the consideration of the testimony in the instant case with plaintiff asserting the deed to be a mortgage, and

the defendant asserting it to be a deed with conditions as to its purpose and object being understood between the parties.

"Whether the instrument should be treated as a deed or mortgage of course depends upon the facts and circumstances of the transaction, the object and purpose for which it was given and received, and whether it was given as security or for a bargain and sale of the land." *Duerden* v. *Solomon,* 33 Utah 468, 473, 94 P. 978, 979; *Thomas* v. *Ogden State Bank* (Utah) 13 P. (2d) 636, 639.

Neither plaintiff nor defendant insists that the instrument was intended as an absolute deed, without condition or purpose other than what it purports to be. The testimony must be considered and weighed for the purpose of determining what the nature and purposes of the instrument were. The testimony of plaintiff, Mrs. Corey, relating to the transaction and her understanding, intention, and purposes, is not contradicted or impeached. It appears that her understanding is corroborated by the behavior of the bank and its officials in the handling of the property and the account after the conveyance. Mrs. Corey was related to Mr. Wattis. She had confidence in him. He told her it would be better for her if he took the property over for the bank in his own name and managed it, because the bank would have money to carry on the running of the property, and that in the course of time it would be paid off; that the bank would be willing to wait for the money she owed it; that Mr. Wattis told her that it would save the property from being foreclosed and taken away from them. Nothing was paid for the deed. It was given as a collateral contract through the grantee as a trustee. The property was to be managed by the bank and Mrs. Corey was to take care of the collection of the rents and suggesting repairs. Mr. Wattis said the bank did not want the property, but wanted its money. Mrs. Corey also testified that when she gave the deed to Mr. Wattis she did not intend to part with the title and ownership of the property.

We do not deem it necessary to state in detail all of the evidence. Reference to the prominent features—and as we think the controlling ones—is all that is necessary. As heretofore indicated, the defendant does not contend there were no conditions attached. While we find no evidence in the record to support the theory of a sale with an option to repurchase within six months, the theory of a right on the part of the plaintiff to sell the property or in any other way to liquidate the bank's claim and have the property reconveyed to the plaintiff is in accord with both the testimony of Mrs. Corey and other witnesses on her behalf. Such position also harmonizes with other matters and circumstances relating to the transaction, and especially with the bank's behavior in the premises, and is not completely out of harmony with defendant's position of an option to repurchase.

If the quitclaim deed were intended as a relinquishment of all the plaintiff's interest in the property, (1) Why was there opened and carried on for a period of twenty-two months, and until the transfer to the defendant, an account in which all the income and expenses relating to the Corey Block were kept separate? (2) Why was a delinquent rent account of some $750 collected by the bank and credited to this account? Manifestly all rents accrued up to the time of the transfer would belong to the plaintiff. (3) Why did the bank retain the notes of the plaintiff for at least a period of thirteen months before indicating an intention of returning them (and the evidence is far from convincing that they were ever returned to the plaintiff), and delay the canceling of the mortgage until the conveyance to defendant? (4) Why was the Corey Block checking account permitted to "pyramid" until the property was transferred to the defendant and thereupon the check book and account turned over to the defendant, and after defendant had added thereto a deposit of $1,500 was permitted to write a check in the sum of $8,294.22 to be applied in liquidation of the claims of the bank, leaving therein a balance November 15, 1919, the day the deal was finally closed, in the sum of $1,292.32, and

the account still carried in the name of the "Corey Block," if this was a purchase and sale and not a mortgage? (5) Why was plaintiff permitted to remain in possession of the property during the whole period and receive an allowance, or salary, and be vested with all the indicia of ownership?

Some explanations and reasons have been suggested, but we deem them of the character that usually arise after a change of intention has taken place in the hope of making them fit a situation firmly fixed before the explanation was thought of. The transactions and behavior of the parties need explanation. For the transactions as indicated by these records and this behavior over a period of years, defendant has offered explanations. Such explanations might possibly explain, but in our opinion they do not reasonably or naturally explain or justify, an interpretation other than that of a continued interest of the plaintiff in the property.

Witnesses in testimony and counsel in argument have used the expression "Other Real Estate Owned" with reference to the bank account relating to the Corey property. We have searched the records and exhibits and find only the three bank accounts, viz., the checking account entitled "Corey Block," "Bills Discontinued," and the account entitled "Corey Real Estate." It may be the bank had a general account heading indicating "Other Real Estate Owned," but, in so far as the "Corey Real Estate" account is concerned, as revealed by the record there is no implication of ownership except as to what may be inferred from the heading "Corey Real Estate," with the debit entries accumulating from January 16, 1918, to June 18, 1919, when the debit balance totaled $22,229.25 and the credit entry of November 15, 1919, in the same amount, thus balancing and closing the account, and the entries in the account "Bills Discounted" are difficult to fit in with any transactions at the particular times of the entries with events occurring at the time some of the entries bear date of making.

While the question of consideration may not be of controlling importance, the general rule is that a subsequent

release or transfer of the mortgagor's equity of redemption may undoubtedly be made to the mortgagee; neither is there anything in the policy of the law which forbids the transfer to the creditor of the debtor's interest. The transaction under such circumstances and when attacked will be scrutinized so as to prevent any unfair advantage being taken of the debtor. It may also be stated that a release to the mortgagee will not be inferred from equivocal circumstances and loose expressions. Generally it must appear by a writing importing in terms a transfer of the mortgagor's interest, or facts must appear such as will operate to estop him from claiming an interest in the property. The release must also be for an adequate consideration. Any marked undervaluation in price will vitiate a release or conveyance of the mortgagor's interest.

Had the quitclaim deed been intended as a release of the mortgagor's interest, in the instant case, such release could easily have been taken by, or made direct to, the bank, stating in terms the purpose and what was intended thereby. Had the bank upon receiving such release or conveyance released the mortgage, returned the notes secured thereby, and returned and canceled the unsecured obligations to the plaintiff, taken full control and management of the property, removed plaintiff therefrom, and collected and held or applied the rents to its own purposes, a far different situation would be presented.

The release, or the quitclaim deed, if it may for the purpose of discussion be regarded as a release, was not taken by the bank. The deed was made to Warren L. Wattis. The indirect method thus taken forces inquiry into the reasons why such method should be adopted rather than a direct release if such was the purpose. That Mr. Wattis was an officer and agent of the bank is a fact; but such being so does not relieve us from the inquiry or necessity of determining why the indirect instead of the direct method was taken. The grantee under the deed was not the creditor, nor is there anything appearing from the conveyance itself that

aids an explanation. The plaintiff owed Warren L. Wattis nothing personally. Such is not the usual course of such transactions. From all of the testimony, it is manifest the plaintiff had the right at least for some time after the deed was executed to redeem the property on payment. There is no evidence that any notice was served by either party, or any agreement or understanding arrived at, after the execution and delivery of the mortgage or the quitclaim deed, or for that matter the warranty deed, indicating any change in the liability relationships of the parties.

As to the question of value of the property as related to consideration, the trial court found "that the value of said premises on said date, or at any time during the years 1918 and 1919, was not substantially in excess of the total amount of the said debts of the plaintiff to the New York Life Insurance Company and to the Utah National Bank of Ogden, that the value thereof has since the year 1919 considerably increased." Just what the finding, "was not substantially in excess of the total amount of said debts," was intended to mean is not clear. The court found the indebtedness to the bank and the insurance company to be $48,732.40. This amount included the New York Life Insurance Company mortgage and the bank's secured indebtedness, also unsecured bank claims. As the court made no specific finding as to the value of the Corey property, it is necessary to advert briefy to the testimony. Witnesses on behalf of defendant gave values of $54,500, $55,000, and $59,775, while witnesses on behalf of plaintiff gave values of $105,000, $104,000, and one witness gave an appraised value for the buildings alone at $65,187. Such is the testimony as to values of 1918 or 1919. In addition thereto, we have a calculated estimate of value, made by the defendant, apparently for the purpose of determining loan values for renewal of the New York Life Insurance Company mortgage in 1922, wherein defendant by three different methods of calculation estaimated the value to be $128,454.50, on a land frontage value of the real estate and an architect's estimate of

the value of the buildings; and a value of $119,172.85 based on a 6 per cent interest earning of 1922 net returns, and a value of $111,700 based on frontage value of adjoining property sold combined with items of equipment, income, and building comparisons.

In view of the trial court's failure to make a specific finding either as to total value, or value in excess of indebtedness other than it was "not substantially" in excess of the found indebtedness, we are convinced that from the testimony a specific finding of value should have been made. Under the testimony, the value of the property was at the time of the conveyance somewhat between $54,500 and $104,000, and, unless the increase in value between 1918 or 1919 and 1922 was at least approximately $24,000, its value was probably somewhat in excess of what may be deduced from these figures. To us it appears that there was a "substantial" difference between the total indebtedness to the insurance company and the bank secured and unsecured, and the value of the property at the time of the conveyance.

In view of all the evidence, we are of the opinion that the plaintiff has supported her burden of proof in accordance with the requirements of the law by clear, satisfactory, and convincing evidence that the property was conveyed by plaintiff to Warren L. Wattis and received by him impressed with a trust related to the mortgage indebtedness and for the purpose of co-operating with plaintiff in the saving of expense, checking repairs and operation, and income from rents, and for the further purpose of applying the income in payment of the indebtedness due and to become due to the bank, and upon such payment to reconvey the property to the plaintiff.

This brings us to the second phase or period of these transactions. In the order, or approximate order, of events, the first thing to transpire was that Warren L. Wattis secured on November 1, 1919, a warranty deed from the plaintiff. The deed was again made to Mr. Wattis, and not to the bank. This deed contained a clause pro-

viding for the assumption of the New York Life Insurance Company mortgage. It may, with some consistency, be argued that this clause placed Mr. Wattis under an obligation which neither he nor the bank had theretofore assumed. Manifestly it in no way changed Mrs. Corey's liability to the insurance company, nor to the grantee nor the bank. She and her property were still liable for the indebtedness. By the time this warranty deed was executed, it had become apparent the property would work itself out if properly managed. The returns were sufficient by that time to warrant that conclusion. The testimony indicates that, before the defendant took over the propery from Mr. Wattis and paid the bank's claims, Mr. Roberts had examined the statements furnished by the bank, the condition of the title, knew of the payments made on the insurance company's mortgage and the conveyances from Mrs. Corey to Mr. Wattis, that each of those conveyances carried a stated consideration of $10, and that far greater values were involved. This was at least constructive notice to him. *Lawley* v. *Hickenlooper,* supra. While there is no direct evidence that the warranty deed was secured at the suggestion or request of Mr. Roberts, we perceive no reason why any one else would be interested in the matter. Aside from the transaction with Mr. Roberts, it could in no way aid either Mr. Wattis or the bank. The same trust relationship was imposed upon Mr. Warren L. Wattis and accepted by him. As heretofore indicated, Mr. Wattis held the fee-simple title subject to the mortgage or trust conditions. The property had demonstrated its ability to liquidate the indebtedness if time to do so were allowed.

The "Corey Block" account was turned over to Mr. Roberts. There had accumulated in that account $7,357.04. He continued to operate the account as Mr. Wattis or the bank had. To whom did that money belong? Evidently under the agreement the bank could have charged that account, but in doing so it would have been compelled under the circumstances to have credited the plaintiff upon her notes

and obligations, or credited the "Corey Real Estate" account, or transferred the account along with the property in partial liquidation of the claims due to the bank, or pay itself and reduce the purchase price of the property. The latter course was not chosen. Thus the defendant received not only notice of the complete status of the matter, but also received the money, which the account of the bank and defendant's subsequent records show went in aid of liquidation of accounts defendant held against the plaintiff.

This property was impressed with a trust in the hands of Warren L. Wattis, the defendant was familiar with every element necessary to advise him of the conditions, and was therefore bound to receive the property likewise impressed. The accumulated account being applied in ■ liquidation of the bank mortgage and the defendant paying to the bank the balance constituted the defendant an equitable assignee of the bank's claim, notwithstanding the notes may have been returned and at that time the mortgage canceled because simultaneously therewith the defendant received title to the property impressed with the trust in favor of the plaintiff.

That the defendant recognized this debtor and trust or mortgage relationship is manifest from his conduct immediately, and for a long time thereafter. The defendant rendered detailed statements monthly to plaintiff for a period of about forty months, showing the earn- ■ nings, expenses, and balance due. It is not necessary to go into detail as to subsequent behavior and relationship of the plaintiff. The relationship of mortgagee or trustee being once established and no showing of its termination, it persists. The first few statements rendered by defendant to the plaintiff so fit in with the transactions and furnish such detail as to make it wellnigh impossible to understand the situation except upon the basis that the defendant was, as we believe, working in harmony with the ideas and purposes of Warren L. Wattis to save the property in question for the plaintiff. The record convinces us

that it was not until some years after defendant took title to the property that his mind began to gradually change from that of the holder of a mortgage right to that of owner. The various steps of the gradual change of mind and interest as to the property are manifest. To his credit be it said that the record likewise discloses that defendant intended that the plaintiff should be properly provided for. Whether the plaintiff will be any better off, or better or as well provided for, is a matter the court may not concern itself about. The parties are entitled to have their rights determined upon the law and the evidence.

On or about the 1st of December, 1919, although the first statements were dated November 1, 1919, the defendant began, and for over three years continued, to make monthly statements to the plaintiff. We think the first four statements referred to in the record as Exhibits Nos. 1, 2, 3, and 4 so impress the defendant with the relationship of claimed creditor of the plaintiff and as holder of the legal title to the property as security for the obligations claimed that argument or analysis or interpretation are all but superflous:

PLAINTIFF'S EXHIBIT NO. 1

Auto Note Acct.                    Ogden, Utah, Nov. 1, 1919
To R. D. Roberts, Dr.
1917
Dec. 27 Pd. on Prin. 1700   Pd. int. to
              12-23-17   $2815.35 ....................$ 45.35
1918
Apr.  2 Pd. int. to 3-13-18 ......................  28.00
May   7 Rec'd from mother ......................          $28.35
May 13 Pd. int. to 6-23-18 ......................  28.00
Sept. 25 Pd. int. to 9-13-18 ......................  28.00
1919
Feb.  2 Pd. int. to 12-28-18 ......................   9.60
Feb.  7 Refunded by bank when mother pd........            9.60
                                                    _____  _____
                                                    $138.95   $37.95
                                                    _____  _____
              Balance ..........................  101.00
        Above balance forwarded to Corey Block Acct.

## PLAINTIFF'S EXHIBIT NO. 2

Note Acct.                                    ` Nov. 1, 1919

To R. D. Roberts, Dr.

1915

Feb. 20 Note ...............................$3,756.28

Apr.  3 Cash by mother ......................                     22.50

Apr. 15 Cash by mother ......................                     20.00

May  7 Cash by mother ......................                     20.00

Dec.  3 Pd. by A. B. C. 4000 shares Prom. Zinc...        200.00

Feb. 20 Interest to date ......................    300.50

Oct.  2 Cash by Lawrence ...................                     50.00

1917

Jan.  1 Interest to date ......................    261.40

1918

Jan.  1 Interest to date ......................    320.40

1919

Jan.  1 Interest to date ......................    346.08

Nov.  1 Interest to date ......................    311.48

                                               $5,296.14   $312.50

                                               312.50

Balance.... .......................$4,983.64

Above balance forwarded to Corey Block Acct.

## PLAINTIFF'S EXHIBIT NO. 3

Corey Block                        Ogden, Utah, Nov. 1, 1919

To Utah Natl. Bank, Dr.

Final settlement made on this basis

Note 8-4-16   No. 10616 ...................$15,000.00

                  Int. to 11-1-19 & Int. pd. ........    3,395.00   $ 1,146.20

Note 8-4-16                             2,100.00

                  Int. to 11-19 .................     475.30

Note 8-7-17   No. 11612 ....................    2,100.00

Note 8-7-17   No. 11613 ....................     591.20

                  Int. to 11-1-19 & Int. pd. .......     437.47        53.80

1918

Jan. 11      1917 taxes 7 filing fee ..........     944.20

                  Int. to 11-1-19 ................     118.81

June 11     N. Y. Life Prin. 1000.00

                  int. 810.00 .................    1,810.00

                  Int. to 11-1-19 ................     174.93

1919

June 18    N. Y. Life Prin. 1000.00
           int. 782.10 .................. 1,782.10
           Int. to 11-1-19 ................. 45.02
Sept. 28   Note Mrs. E. F. C. & R. D. R.... 480.00
           Int. to 11-1-19 ................. 3.20
           Carrying charge ............... 500.00
           Int. 7% on open acct........... 340.30
           Special allowance ............. 122.71
Nov. 15    Balance in open acct. .......... 7,357.84

           Balance (red) .......$29,957.23  $ 9,020.85
                                (red)   20,936.38

### PLAINTIFF'S EXHIBIT NO. 4

Ogden, Utah, Nov. 1, 1910

Corey Block
To R. D. Roberts, Dr.
Payment to bank .....................................$20,000.00
Deposit in Corey Block Acct. ......................... 1,500.00
Auto Note Acct. Bal. ................................. 101.00
Note Acct. Bal. ...................................... 4,983.64

   Balance  .........................................$26,584.64

The above amount is the total due me, all accounts thrown in together.

Ralph.

The record shows the defendant to be a careful, methodical business man. His records of the income and expenses relating to the Corey Block property are full and complete, and show that defendant knew from time to time the exact status and earning power of the property. The record discloses net profits derived from the property for the year 1920, $6,260.54; for the year 1921, $6,370.36; for the year 1922, $7,657.01; for the year 1923, $7,710.58; for the year 1924, $8,224.48; and for the year 1925, $8,899.22. Defendant also in harmony with the statements, Exhibits Nos. 1, 2, 3, and 4, entered in a book account the same items referred to in the Exhibit No. 4, supra, the sum of $26,584.64, and

kept an account of receipts and disbursements, charges, and credits for interest, until June 18, 1926, when the account was closed, having been paid in full.

As late as 1928 the defendant apparently had not fully come to the conclusion that he would take the position of being the absolute owner of the property. Lawrence Corey, in an inquiry about the property, said, among other things: "I wrote you some time ago as to your opinion as to whether it might not be better now that the tight place has been passed for the title to mother's property to be made back to her." Defendant, among other things, replied: "In regard to the property, Lawrence, it is not a proper time to discuss it. I have not arrived at a definite solution in my own mind, but hope the final outcome will be pleasing to all concerned."

Details of evidence might be examined and distinctions made, and as to some matters there are sharp conflicts in the evidence, but as to the controlling elements of the testimony it is rather free from conflict. That it may be susceptible of construction may depend somewhat upon the interest and approach. We think, however, the record discloses with clearness and positiveness that Warren L. Wattis was a friend, relative, and interested and confidential adviser of Mrs. Corey; that he undertook in good faith to get the Corey property in position to better protect the bank and ultimately work out a solution of the problem and ultimately save the property for the plaintiff. We are likewise convinced that Ralph D. Roberts, the defendant, bore and maintained the same confidential and friendly relationship, and when he took over the property, he was cooperating with Mr. Wattis and hoped and intended to ultimately work out the indebtedness and redeem and save it and return it to the "mother" of whom he thought so much, and who had done so much for him; that as time went on the defendant continued a desire to protect Mrs. Corey, but had not been able to find a solution to properly protect her without throwing the situation open for others to participate in the benefits

growing out of the efforts and results his ability and interest had been the means of saving.

We find no merit in respondent's cross-assignments of error. The finding of the trial court that the cause of action of plaintiff is not barred is affirmed.

From what has been said, it is clear that the judgment of the trial court must be set aside, and the cause remanded, with directions to recast such of the findings as are inconsistent with the findings and conclusions herein and to make new findings to the effect that the plaintiff is the owner of the title to the property in question, that the defendant be required to convey the property to the plaintiff subject to all liens and encumbrances properly existing against the said property, and that defendant, until released from liability properly incurred by him, be protected against such liability by a lien against the property; and, further, that the parties be permitted, if they be so minded, to amend their pleadings so as to provide for an accounting between the parties, to the end that there be a fair and equitable adjustment as to rents, services and such other matters as will do equity in the premises. It is so ordered. Appellant to recover costs.

STRAUP, C. J., and ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.