BARRETT et al. v. VICKERS et al.

No. 6322. Decided September 10, 1941. (116 P. 2d 772.)

For rights of parties under oral agreement to buy land for another, see notes, 42 A. L. R. 10; 54 A. L. R. 1195.
See also 26 R. C. L. 1219 (8 Perm. Supp. p. 5859).

*Irvine, Skeen & Thurman,* of Salt Lake City, for appellants.

*Jensen & Jensen,* of Ephraim, for respondents.

*Skeen & Skeen,* of Salt Lake City, for intervenors and respondents.

PRATT, Justice.

S. T. Vickers died. He had owned a ranch near Nephi, Utah, known as the S. T. Vickers ranch. Arliean Vickers Barrett, Ethel Vickers Barrett, Leland Vickers, and Sterling Vickers are children of S. T. Vickers, deceased. The father deeded the property to Leland subject to a mortgage in favor of the State of Utah. Leland was unable to keep up the payments, and the State foreclosed. As the time for redemption neared expiration the members of the family and their husbands and wives—Leland was a bachelor —discussed what should be done to save the place.

The controversy in this case arises over the question of whether or not they agreed to buy the place from the State of Utah, each to take an undivided ¼ interest therein, as follows: ¼ to the Arliean Barretts, ¼ to Leland Vickers, ¼ to the Sterling Vickers, and ¼ to the Ethel Barretts.

On or about July 21, 1938, Arliean Vickers Barrett tendered to the State the sum of $355 as down payment for the ranch at a price of $3,550, to be paid in installments over a number of years. A contract was entered into between the State and Mrs. Barrett pursuant thereto upon which her husband, George C. Barrett, became a party in December, 1938. As plaintiffs in this case these Barretts

instituted this suit to get Leland and Sterling and his wife Ethelyn off the ranch, claiming it as their own. Defendants Leland, Sterling and Ethelyn answered setting up that they owned undivided ¼ interests. Plaintiffs denied this and also alleged that such a claim was barred by the Statute of Frauds.

Joseph Barrett and his wife Ethel intervened claiming that they, too, had an undivided ¼ interest. To this claim plaintiffs raised the same defense as to the claim of defendants. The lower court found in favor of the defendants and in favor of the intervenors, and plaintiffs have appealed the case.

The defendants, the intervenors, and the witnesses submitted on behalf of each testified in substance as follows: That the property should be bought jointly, but as Leland and Sterling were each financially embarrased at the time, the Joseph Barrets would advance Sterling's ¼ of the down payment, and the George C. Barretts would advance Leland's ¼ of the down payment.

On or about July 12, 1938, Joseph Barrett delivered to Mrs. George Barrett (Arliean) $155, for which the following receipt was given:

"July 12, 1938, Received from Jos. S. Barrett, One Hundred Fifty-five Dollars to apply on purchase of ranch (S. T. Vickers) $155.00. **Mrs. Geo. C. Barrett.**"

Plaintiffs acknowledge receiving this sum and that it became part of the $355 paid by them as down payment to the State of Utah.

Joseph Barrett testified that the difference between the $155 and ½ of the $355 was to be made up in a credit to George C. Barrett upon a judgment against him in favor of Joseph. It is admitted that neither Leland nor Sterling personally paid any part of the $355. Later, tenders of their share of subsequent payments were made by them but refused by the George Barretts.

On September 2, 1938, Mrs. Arliean Barrett, a plaintiff and appellant herein, wrote to her brother Leland as follows:

Salt Lake City
"Sept. 2,-38

"Mr. Leland Vickers.
 "Dear Lel:

"I was going to write to you to-night and tell you about the contract they wanted me to sign. We have not had time to go up to the capitol and fight it out yet, but we will.

"We put $200.50 in cash and have a $5.00 lawyer bill to pay besides the trips up there we have had to make because they tried to rook us, the So & So'es (We bid $3.500.00 and payed $355.00 cash, and .50 to send it to them) Joe put up $155.00 and if he could get some of it back right now he would sure be glad, they are in an awful jam it cost $125.00 to get that contract for Luine besides Ethels expenses and she is in Cal. broak. Joe borrowed $100.00 from Free and the rest from Mauris and on his furniture. They didn't pay the taxes on their place and are behind with the rent so you can see Joe is stuck plenty. We are struggling like heck but I guess we will make out some way. We cant get possession of the place until Dec. 15 so we havent known what to do, or how to plan. We want to plant nursery lines and maby some garden that we can all benifet from.

"Sterl and Ethelyn wanted to go down awhile ago but I cant see how they could do anything, but if you can, and if you can figure anything out you take hold and we will back you up, the place is as much yours as owers Anything you figure out for yourself is OK. We cant run it and grow shrubs too.

"The first payment comes due June 1st, 39, and is according to their figures $138.46, the next Dec. 1, $142.18, the third June 1, $140.58, the fourth Dec. 1, $138.99. they seem to have uncrossed their eyes after that and have it right. I'll copy the part about the mineral rights on a separate paper What about the cattle permit we want that back dont we With most of the place range we ought to try to restock it as soon as we can hadnt we.

 * * *

"What are your plans Lel. Let us know will you. All we can do yet is to pay back the money we borrowed. it comes to $57.00 per mo. We have payed one mo. but we didnt make any money last month.
* * *"

"Well that about covers it I guess so I'll close my half century effort. I hope you havent had it too darn tough this Summer.

 "Love from all.
 "Your Loving Sister
 "Arliean

"A description of the property comes first then this *gem*: Excepting and reserving to the State of Utah all coal oil, gas, mines, metals, gravel, and all other minerals of whatsoever kind or nature in the above land, and to it, or persons authorized by it the right to prospect for, mine and remove the same upon compliance with the conditions and subject to the limitations of Chapter 107, Sessions Laws 1919, as ammended Session Law 1921 and ammendments thereto"

On the witness stand George C. Barrett, husband of Arliean and the other plaintiff and appellant herein, testified as follows:

"Q. Now, counsel asked you if you regarded all of the others as trespassers on this property. What did not mean by that—understand him to mean by that? A. I considered they hadn't completed negotiations. I mean my brother was the only one I considered that had any interest whatever, and it was a pending negotiation, and he hadn't completed the negotiations."

\*　　　\*　　　\*

"Q. When you wrote this statement of March 25, 1939, it was not correct: 'When Joe put his money ($155) into the down payment on the ranch, I didn't know that the state would not accept him as a buyer. I am not responsible for their decision.' Is that statement incorrect? A. That is correct."

\*　　　\*　　　\*

"Q. You testified this morning that you talked to Mr. McCann at the State Land Board and he told you that he would not be willing to put Leland or Sterling on the contract. When was that conversation had? A. I think it was December, about the 20th or 22nd, 1938, \* \* \* He said he would not personally—he said 'I would not put them on the contract, and my advice to the Land Board will be the same. We have had trouble with one or two other people where we have put people on the contract, and it has caused a lot of trouble, and our advice will be that we won't put them on the contract.' "

\*　　　\*　　　\*

"Q. And what, if anything, was said by your brother, as to the amount that was to be bid for the property? A. Well, he knew that we were to put in a bid for $350.

"Q. You mean $3500? A. Yes, $3500. He suggested that we bid $50 more for the property and put up $5 more as ten per cent on the down payment."

The receipt, the letter, and this testimony of George C. Barrett are rather convincing of the truth of the testimony of the defendants and that of the intervenors. If Leland was not interested to the same extent as the other three groups, ¼ each, the contents of the letter are, to say the least, strange. If it was not contemplated that the contract was to be for all then why the discussion between George Barrett and the representative of the State Land Board as to the others being on the contract? If, as plaintiffs claim, they were buying for themselves, then why the statement by George Barrett to the effect that "we" should bid $50 more, etc., referring to the advice of his brother Joseph?

Admittedly, the George Barretts, before they took action, had consulted an attorney. This conforms to Mr. Barrett's statement on the witness stand, referring to the $155 by Joseph, wherein he said:

"He" (referring to Joseph) "just says: 'Here is $155, you get the place and we will decide it after, later.'"

There is a rule of law that a general payment upon a purchase price entitles the payor to a lien only to the extent of the payment, whereas a part payment for a specific interest entitles him to that interest in spite of the size of the payment. Considering the fact that Joseph already had an unsatisfied judgment against George, it is strange that he would be so free and easy with the $155. One wonders if George Barrett did not have in mind the rule of law above stated when he testified as he did.

We are of the opinion that the lower court was clearly justified in finding the facts, as he did, in favor of defendants and the intervenors.

Was the lower court's application of the law correct?

Section 33-5-1, R. S. U., 1933, reads:

"No estate or interest in real property, other than leases for a term not exceeding one year, nor any trust or power over or concerning real property or in any manner relating thereto, shall be created, granted, assigned, surrendered or declared otherwise than by act or

operation of law, or by deed or conveyance in writing subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful agent thereunto authorized by writing."

It excepts from the requirement of writing, trusts arising by "act or operation of law." There is no question in this State about that matter. Parol evidence is admissible to show a trust relationship by operation of law. *Corey* v. *Roberts*, 82 Utah 445, 25 P. 2d 940.

Was the evidence "clear, unequivocal, and explicit," the property "clearly and distinctly" set out, and the purpose of the trust "plainly indicated"? Quotations are from *Jensen* v. *Howell*, 75 Utah 64, 282 P. 1034. We think so. There were four heirs of S. T. Vickers involved. Logically they would desire equal interests. "The place is as much yours as ours," says Arliean's letter to Leland. She also stated:

"We want to plant nursery lines and maybe some garden that we can *all* benefit from." (Italics added.)

In the letter she speaks of matters such as cattle permits and restocking the place, using the term "we." The "we" undoubtedly includes all the others and not just her immediate family, otherwise there would be no reason for recognizing Leland as having an interest at all. The testimony submitted on behalf of defendants and the intervenors is clear as to the property and interests involved. There is no ambiguity about the situation. Either each family had an undivided $\frac{1}{4}$ interest or plaintiffs owned it all, and the evidence supports the first alternative.

Is the part payment of the purchase price sufficient to create a trust to the extent of an interest greater than the amount paid? We are of the opinion that it is.

An annotation upon this point is found in 2 Ann. Cas. 667; see, also, 42 A. L. R. 10 et seq. If the evidence shows that the payment made was for a specific share and not merely a general payment toward the purchase price, the trust will be established to the extent of

that share, even though the amount paid is not in the same proportion, to the purchase price, that the share bears to the whole property.

A case like the present illustrates the necessity for such a rule. Payments are to be in installments over a number of years. As between the purchasers, one may not get an advantage over another, limiting the latter's interest to the amount paid, at the same time claiming a full share or more for himself. In this case, as between themselves, the Vickers heirs and their families stand upon an equal footing. Each has an undivided $\frac{1}{4}$ interest in the ranch, which, of course, may be cut off by the State of Utah if the payments are not kept up. Until one party or another has defaulted in his share of a payment, the issue of whether or not the others, if they pay his share, may increase their interest, does not arise. That question is not before us in this case. The fact, if it be a fact, that the State Land Board would not recognize anyone on the contract but the George C. Barretts does not give plaintiffs the right to claim the property as their own, in spite of the agreement they had with the others.

The judgment and decree of the lower court is affirmed. Costs to respondents.

MOFFAT, C. J., LARSON, and McDONOUGH, JJ., concur.

WOLFE, Justice (concurring in the result).

I concur on the ground that the Statute of Frauds did not bar the introduction of parol testimony as to the transactions between the parties. I do not think we need say that the evidence was "clear, unequivocal and explicit." While the prayer in its form partakes somewhat of a request for equitable relief, the action is really one of ejectment calling for remedies encompassed by that action. Hence, it is an action at law. That means that all we need determine is whether we can say as a matter of law that to the trial judge it should not have been so "clear and un-

equivocal." I cannot say that the trial judge could not himself have considered the evidence "clear and unequivocal." Even if we would not consider it "clear and unequivocal" it was within the range wherein reasonable minds might differ as to that. Such is all that is necessary.